**FILED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

NOV - 6 2002

CHARLESTON DIVISION

LARRY W. PROPES, CLERK
COLUMBIA, S.C.

SOUTHEAST BOOKSELLERS ASSOCIATION;
PRINT STUDIO SOUTH, INC.; AMERICAN
BOOKSELLERS FOUNDATION FOR
FREE EXPRESSION; ASSOCIATION OF
AMERICAN PUBLISHERS, INC.; FAMILIES
AGAINST INTERNET CENSORSHIP, COMIC
BOOK LEGAL DEFENSE FUND,

2 02 3747 23

     **Plaintiffs,**

     **v.**

CHARLIE CONDON, in his official
capacity as ATTORNEY GENERAL OF THE
STATE OF SOUTH CAROLINA;  WALTER M.
BAILEY, JR., BARBARA R. MORGAN, C. KELLY
JACKSON, JAY E. HODGE, JR., W. TOWNES
JONES IV, W. BARNEY GIESE, JOHN R. JUSTICE,
TREY GOWDY, RALPH E. HOISINGTON,
DRUANNE D. WHITE, DONALD V. MYERS,
EDGAR L. CLEMENTS III, ROBERT M. ARIAIL,
RANDOLPH MURDAUGH III, J. GREGORY
HEMBREE, THOMAS E. POPE, in their official
capacities as SOUTH CAROLINA CIRCUIT
SOLICITORS,

     **Defendants.**

Civil Action No._____

## COMPLAINT

### PRELIMINARY STATEMENT

1.     The State of South Carolina has enacted a broad censorship law that imposes

severe content-based restrictions on the availability, display, and dissemination of

constitutionally-protected speech on the Internet by making it a crime to "sell[ ], furnish[ ], present[ ], distribute[ ]," or "allow review or perus[al]" of a variety of materials in the form of "digital electronic files" that are "harmful to minors."  2001 Acts 81, § 10, (amending S.C. CODE ANN. § 16-15-375), *codified at* S.C. CODE ANN. § 16-15-375.  Although the provision was enacted with the apparent goal of protecting minors from images deemed unsuitable for them, it has the effect of prohibiting adults from viewing and sending a wide array of valuable, constitutionally-protected images they have a First Amendment right to view and send.  It also prohibits older minors from gaining access to material they have a constitutional right to view, but that are "harmful" to young children.  Moreover, because all speech on the Internet is accessible in South Carolina, regardless of the geographical location of the person who posted it, the Act has the effect of prohibiting constitutionally protected communications nationwide.  Accordingly, this provision, which took effect on July 20, 2001, along with S.C. CODE ANN. § 16-15-385 (collectively the "Act"), violates the First Amendment of and the Commerce Clause of the U.S. Constitution.  A copy of the Act is attached as Exhibit A.

2.    The United States Supreme Court invalidated a similar federal law restricting speech on the Internet on First Amendment grounds in Reno v. ACLU,  521 U.S. 844 (1997), aff'g 929 F. Supp. 824 (E.D. Pa. 1996).  Likewise, federal courts have struck down at least seven state laws containing similar content-based restrictions on speech on the Internet. *See* Cyberspace Communications, Inc. v. Engler, 55 F. Supp. 2d 737 (E.D. Mich. 1999) (granting preliminary injunction), aff'd, 238 F.3d 420 (6th Cir. 2000); Cyberspace Communications, Inc. v. Engler, 142 F. Supp. 2d 827 (E.D. Mich. 2002) (permanently enjoining enforcement of Michigan criminal statute prohibiting online dissemination of material harmful to minors); ACLU v. Johnson, 194 F.3d 1149 (10th Cir. 1999) (same; New Mexico statute), aff'g 4 F. Supp.

2d 1029 (D.N.M. 1998); <u>Bookfriends, Inc. v. Taft</u>, __ F. Supp. 2d __, No. C-3-02-210, 2002
WL 2022537, at * (W.D. Ohio Aug. 30, 2002) (preliminarily enjoining all Ohio criminal statutes
incorporating definition of "harmful to minor" including that prohibiting Internet dissemination
of material harmful to minors); <u>ACLU v. Napolitano</u>, CIV 00-505 TUC ACM (D. Ariz. June 14,
2002) (unpublished opinion) (same; Arizona statute); <u>Am. Booksellers Found. For Free
Expression v. Dean</u>, 202 F. Supp. 2d 300 (D. Vt. 2002) (striking down Vermont criminal statute
prohibiting online dissemination of material harmful to minors); <u>PSINet Inc. v. Chapman</u>, 167 F.
Supp. 2d 878 (W.D. Va. 2001) (same; Virginia statute), <u>appeal filed</u>, No. 01-2352 (4th Cir.);
<u>State v. Weidner</u>, 611 N.W.2d 684 (Wis. 2000) (same; Wisconsin statute); <u>Am. Libraries Ass'n
v. Pataki</u>, 969 F. Supp. 160 (S.D.N.Y. 1997) (preliminarily enjoining under dormant Commerce
Clause New York criminal statute prohibiting online dissemination to minors of sexually explicit
materials).

       3.     The Act criminalizes any work communicated on the Internet and accessible in
South Carolina which contains a depiction of nudity or sexual conduct and which, taken as a
whole, is deemed "harmful to minors." Because of the way the Internet works, this prohibition
could criminalize the posting of some of the artwork on the website of PRINT STUDIO
SOUTH; artwork and other material posted on the website of the members of the plaintiff
COMIC BOOK LEGAL DEFENSE FUND; educational or artistic book jackets or book contents
posted on the websites maintained by the members of plaintiffs SOUTHEAST BOOKSELLERS
ASSOCIATION, AMERICAN BOOKSELLERS FOUNDATION FOR FREE EXPRESSION,
and ASSOCIATION OF AMERICAN PUBLISHERS, INC.; and artistic, scientific or
educational materials that otherwise would be available to members of plaintiff FAMILIES
AGAINST INTERNET CENSORSHIP both within and outside South Carolina.

4.      The speech at issue in this case *does not include* obscenity, child pornography, or harassing speech; nor is it limited to speech used to entice or lure minors into unlawful activity. To the contrary, material distributed by members of plaintiffs PRINT STUDIO SOUTH, SOUTHEAST BOOKSELLERS ASSOCIATION, AMERICAN BOOKSELLERS FOUNDATION FOR FREE EXPRESSION, ASSOCIATION OF AMERICAN PUBLISHERS, INC., and the COMIC BOOK LEGAL DEFENSE FUND, and access to which is sought by adult members of plaintiff FAMILIES AGAINST INTERNET CENSORSHIP, is fully constitutionally protected as to adult viewers. This includes, for example, valuable works of art, popular culture, safe-sex and other educational and health-related information, and a wide range of robust human communication and discourse about current issues and personal matters that may include provocative images.

5.      The Internet is the most participatory marketplace of mass speech yet developed, and is in many ways a far more speech-enhancing medium than radio, television, print, the mails, or the proverbial village green. Hundreds of millions of people can now engage in interactive communication on a national and global scale via computer networks that are connected to the Internet. The Internet enables average citizens, with a few simple tools and at a very low cost, to participate in local or worldwide conversations, publish an online newspaper, distribute an electronic pamphlet, and communicate with a broader audience than ever before possible. The Internet also provides millions of users with access to a vast range of information and resources. Internet users are far from passive listeners—rather, they are empowered by the Internet to seek out exactly the information they need and to respond with their own communication if desired.

6.     There are no reasonable technological means that enable users of the Internet to ascertain the age of persons who access their communications, or to restrict or prevent access by minors to certain content.

7.     Therefore, because of the way the Internet works, the Act's prohibition on the distribution to minors of material that is in the form of "digital electronic files" and that is "harmful to minors" effectively bans distribution of that same constitutionally protected material to adults.

8.     Moreover, because the Act makes no distinction between speech that is harmful to younger and older minors, it prohibits distribution to adults of material deemed unsuitable for the youngest Internet users—which includes children as young as five to ten years old.

9.     Material deemed harmful to an eight-year old under the statute may have great educational, scientific or literary value for an adult or an older minor, such as a 17-year old.  Yet the possibility that an eight-year old could access that image will deter Internet content providers from distributing the image, and adults and older minors will be unable to view it.

10.     Consequently, the Act reduces adult and older-minor speakers and users in cyberspace to reading and communicating only material that is suitable for young children, by prohibiting or chilling a substantial amount of constitutionally protected speech.

11.     In addition, the Act violates the Commerce Clause of the United States Constitution because it regulates commerce occurring wholly outside of the State of South Carolina, imposes an impermissible burden on interstate and foreign commerce, subjects interstate use of the Internet to inconsistent state regulations, and imposes burdens on interstate commerce that far exceed any intra-state benefits in the nature of protection of minors against exposure to harmful materials.  An online user outside of South Carolina cannot know whether

5

someone in South Carolina might download his or her content posted on the Internet. Nor can he

or she prevent posted material from being accessed on the Internet by minors in South Carolina.

Consequently, Internet users outside of South Carolina must comply with South Carolina law or

risk criminal prosecution.

12.    Plaintiffs represent a broad range of individuals and entities who are speakers and

content providers on, and users of, the Internet. Plaintiffs post and discuss content in the form of

visual art and images, literature, and books, including resources on AIDS prevention and other

health issues, and information for heterosexual as well as gay and lesbian adults and older

minors. Plaintiffs also represent a broad range of families and family members who are users of

the Internet, and who use it to obtain access to such content.

13.    Plaintiffs seek to have the Act declared unconstitutional and void, and to have the

State permanently enjoined from enforcing the Act, by reason of the First and Fourteenth

Amendments to, and the Commerce Clause of, the United States Constitution.

## JURISDICTION AND VENUE

14.    This case arises under the U.S. Constitution and the laws of the United States and

presents a federal question within this Court's jurisdiction under Article III of the Constitution

and 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). It seeks remedies under 28 U.S.C. §§ 2201

and 2202, 42 U.S.C. §§ 1983 and 1988, and FED. R. CIV. P. 65.

15. Venue is proper in this district under 28 U.S.C. § 1391(b).

## THE PARTIES

16.    Plaintiff SOUTHEAST BOOKSELLERS ASSOCIATION ("SEBA") is a non-

profit membership association incorporated in Georgia that has its principal place of business in

Columbia, South Carolina. SEBA represents booksellers in South Carolina, as well as in

Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, Tennessee, and Virginia, many of whom sell materials that contain nudity and descriptions of the nude human body, and which deal frankly with the subject of human sexuality. Included in its membership are owners, managers and employees of independent bookstores, publishers' representatives, publishers, wholesalers, librarians, book reviewers, and writers. SEBA's members are not "adult bookstores." Many SEBA members have their own web pages that reproduce the covers and the contents of books sold in stores. Many member bookstores also use the Internet and electronic communications to obtain information and excerpts of books from publishers. SEBA members' right to learn about, acquire, and distribute material depicting nudity and sexual conduct, and their patrons' right to learn about and purchase such materials, will be seriously infringed by the Act if it is not enjoined because SEBA members and the publishers with whom they transact business will be forced to self-censor or risk prosecution under the Act. SEBA sues on its own behalf, on behalf of its members who use online computer communications systems to sell books and to provide excerpts and other materials concerning the books they carry, and on behalf of the patrons of their member bookstores.

17.     Plaintiff PRINT STUDIO SOUTH, INC. is a non-profit arts organization incorporated under the laws of the State of South Carolina that has its principal place of business in Charleston, South Carolina. This community-based printmaking organization is dedicated to promoting fine art printmaking as well as educating artists and the public about fine art prints and printmaking techniques. PRINT STUDIO SOUTH provides open access to professional studio facilities, technical assistance to artists, innovative educational programs, seminars, and exhibitions. Its approximately 90 members are South Carolina artists who work in a wide variety of artistic media, including screen printing, photography, lithography, etching, and aquatint.

PRINT STUDIO SOUTH'S website, www.printstudiosouth.org, displays the artwork of a number of its members, some of which contains depictions of the nude human body. PRINT STUDIO SOUTH'S members' right to display art depicting the naked human body, and the right of the visitors to their website to view and purchase such materials, will be seriously infringed by the Act if it is not enjoined because PRINT STUDIO SOUTH and its members will be forced to self-censor or risk prosecution under the Act. PRINT STUDIO SOUTH sues on its own behalf, on behalf of its members, and on behalf of the visitors to its website.

18.    Plaintiff AMERICAN BOOKSELLERS FOUNDATION FOR FREE EXPRESSION ("ABFFE") was created as a non-profit charitable organization by the American Booksellers Association in 1990 to inform and educate booksellers, other members of the book industry, and the public about the dangers of censorship and to promote and protect the free expression of ideas, particularly freedom in the choice of reading materials. ABFFE, which is incorporated in Delaware and has its principal place of business in New York, has hundreds of bookseller members who are located from coast to coast, as well as in the State of South Carolina, many of whom sell materials that contain nudity and depictions of the nude human body, and which deal frankly with the subject of human sexuality. ABFFE's members are not "adult bookstores." Many member bookstores use the Internet and electronic communications to obtain information and excerpts of books from publishers. Many member bookstores also have their own Web pages that reproduce the covers and the contents of books sold in stores, as well as discussing the contents of such books. ABFFE members' right to learn about, acquire, and distribute material containing nudity and depicting and discussing sexual conduct, and their patrons' right to learn about and purchase such materials, will be seriously infringed by the Act if it is not enjoined because ABFFE members and the publishers with whom they transact business

8

will be forced to self-censor or risk prosecution under the Act. ABFFE, most of whose members are bookstores in the United States, sues on its own behalf and on behalf of its members who use online computer communications systems.

19.     Plaintiff ASSOCIATION OF AMERICAN PUBLISHERS, INC. ("AAP") is the national association for the book publishing industry in the United States. AAP is incorporated in New York, and has its principal places of business in New York and the District of Columbia. AAP's approximately 300 members include most of the major American commercial book publishers, as well as smaller and non-profit publishers, university presses and scholarly associations. AAP members publish hardcover and paperback books in every field and a range of educational materials for the elementary, secondary, post-secondary and professional markets. Members of AAP also produce computer software and electronic products and services. Although their businesses are based primarily on print publishing, AAP's members use the Internet actively. AAP's members create electronic products to accompany and supplement their printed books and journals; create custom educational material on the Internet; communicate with authors and others, receive manuscripts, and edit, typeset, and design books electronically; transmit finished products to licensed end-user customers, communicate with bookstores and other wholesale and retail accounts, and promote authors and titles online. Further, many of AAP's members have Web pages and provide information on the Internet. Some of the online content provided by AAP's members contains depictions of nudity or sexual conduct that could be deemed "harmful to minors" under the Act. If the Act is not enjoined, AAP members will be forced either to risk criminal liability or to stop providing online access to constitutionally protected books and related materials. AAP represents an industry whose very existence depends on the free exercise of rights guaranteed by the First Amendment. AAP sues on its own

9

behalf, on behalf of its members who use online computer communications systems to post excerpts of, and materials concerning, their publications, and on behalf of the readers of these online materials.

20.    Plaintiff FAMILIES AGAINST INTERNET CENSORSHIP ("FAIC") is a not-for-profit, unincorporated association, with members located in South Carolina and throughout the country and the world. FAIC, which has its principal place of business in Colorado Springs, Colorado, represents member families with Internet access and at least one child at home who are interested in restraining excessive government regulation of Internet content, and who believe that such decisions are best left to parents. FAIC members' right to learn about and acquire educational and artistic material appropriate to the ages of their children will be seriously infringed by the Act if it is not enjoined, because much such material, if it contains nudity or depicts sexual conduct, will be removed from the Internet by content providers who will be forced to self-censor or risk prosecution under the Act. FAIC sues on its own behalf, and on behalf of its members, both within and outside of South Carolina, who use the Internet to assist in raising and educating their children.

21.    The COMIC BOOK LEGAL DEFENSE FUND ("CBLDF") is a non-profit corporation dedicated to defending the First Amendment Rights of the comic book industry. CBLDF, which has its principal place of business in Northampton, Massachusetts, represents over 1,000 comic book authors, artists, retailers, distributors, publishers, librarians, and readers located in South Carolina and throughout the country and the world. Comics are a graphic-based art form that has rapidly adapted its content and commerce for the Web. Today, the largest individual retailers of comic books in the United States are Internet-based, while hundreds of "web comics" artists are posting work every year. Some of their material involves adult themes

10

or contains mild depictions of nudity. The CBLDF sues on its own behalf; on behalf of the authors, artists, retailers, and publishers of comics who communicate using the Web; and on behalf of the consumers who read or purchase comics online.

22.     Defendant Charlie Condon is the Attorney General of the State of South Carolina and is sued in his official capacity as such. He is the chief law enforcement officer of the State of South Carolina. Attorney General Condon retains general prosecutorial authority to ensure that the laws (including the Act) are faithfully executed, and has statewide authority to prosecute criminal cases. Pursuant to the Constitution of the State of South Carolina, defendant Condon is "the chief prosecuting officer of the State with authority to supervise the prosecution of all criminal cases in courts of record," including those under the Act. S.C. CONST. ART. V, § 24.

23.     Defendants Walter M. Bailey, Jr.; Barbara R. Morgan; C. Kelly Jackson; Jay E. Hodge, Jr.; W. Townes Jones IV; W. Barney Giese; John R. Justice; Trey Gowdy III; Ralph E. Hoisington; Druanne D. White; Donald V. Myers; Edgar L. Clements III; Robert M. Ariail; Randolph Murdaugh III; J. Gregory Hembree; and Thomas E. Pope are the Solicitors for the sixteen Judicial Circuits in the State of South Carolina, and are sued in their official capacities as such. Defendant Ralph E. Hosington is the Solicitor for the Ninth Judicial Circuit, which includes Charleston, South Carolina. They each have authority to prosecute criminal violations in their respective Circuits.

### THE ACT

24.     S.C. CODE ANN. § 16-15-385 provides in relevant part:

> (A) A person commits the offense of disseminating harmful material to minors if, knowing the character or content of the material, he:
>
>> (1) sells, furnishes, presents, or distributes to a minor material that is harmful to minors; or

11

(2) allows a minor to review or peruse material that is harmful to minors . . . .

25.    On July 20, 2001, South Carolina Governor Jim Hodges signed 2001 Acts 81, §10, amending S.C. CODE ANN. § 16-15-375, which, effective July 20, 2001, provides the definitions for § 16-15-385.

26.    As thus amended in 2001, the Act provides in pertinent part:

The following definitions apply to Section 16-15-385, disseminating or exhibiting to minors harmful material or performances;

\* \* \*

(2) "Material" means pictures, drawings, video recordings, films, digital electronic files, or other visual depictions or representations . . . .

S.C. CODE ANN. § 16-15-375, as amended.

27.    The term "harmful to minors" is defined by S.C. CODE ANN. § 16-15-375(1), which provides:

"Harmful to minors" means that quality of any material or performance that depicts sexually explicit nudity or sexual activity and that, taken as a whole, has the following characteristics:

(a) the average adult person applying contemporary community standards would find that the material or performance has a predominant tendency to appeal to a prurient interest of minors in sex; and

(b) the average adult person applying contemporary community standards would find that the depiction of sexually explicit nudity or sexual activity in the material or performance is patently offensive to prevailing standards in the adult community concerning what is suitable for minors; and

(c) to a reasonable person, the material or performance taken as a whole lacks serious literary, artistic, political, or scientific value for minors.

28.     "Minor" is defined as "an individual who is less than eighteen years old."  S.C. CODE ANN. § 16-15-375(3).

29.     Under S.C. CODE ANN. § 16-15-385(C), "mistake of age is not a defense to a prosecution under this section."

30.     The Act provides no affirmative defenses that are reasonably available to most Internet content providers.  Thus, the vast majority of online speakers are faced with the threat of criminal prosecutions against which they have no affirmative defenses.

31.     A violation of the Act is punishable by imprisonment of not more than five years or a fine of not more than $5,000, or both.  See S.C. CODE ANN. § 16-15-385(D).

## FACTS

### The Internet

32.     The Internet is a decentralized medium of communication that links people, institutions, corporations and governments around the world.  It is a giant computer network that interconnects innumerable smaller groups of linked computer networks and individual computers.  Although estimates are difficult due to its constant and rapid growth, the Internet is currently believed to connect more than 220 countries and over 580 million users worldwide.  In addition, approximately 93% of all Internet users use e-mail.  In 2001, approximately 12 billion e-mail messages were sent a day, a figure which is expected to climb to 35 billion by 2005.

33.     Because the Internet merely links together numerous individual computers and computer networks, no single entity or group of entities controls the material made available on the Internet or limits the ability of others to access such materials.  Rather, the range of digital information available to Internet users—which includes text, images, sound and video—is

individually created, maintained, controlled and located on millions of separate individual computers around the world.

34.    The Internet presents extremely low entry barriers to anyone who wishes to provide or distribute information or gain access to it.  Unlike television, cable, radio, newspapers, magazines or books, the Internet provides the average citizen with an affordable means for communicating with, accessing and posting content to a worldwide audience.

**How People Access the Internet**

35.    Individuals have several easy means of gaining access to computer communications systems in general, and to the Internet in particular.  Many educational institutions, businesses, and local communities maintain a computer network linked directly to the Internet and enable users easily to gain access to the network.

36.    Internet service providers ("ISPs") allow subscribers to dial into the Internet by using a modem and a personal computer to access computer networks that are linked directly to the Internet.  Some ISPs charge a monthly fee ranging from $15-50 monthly, but some provide their users with free or very low-cost Internet access.

37.    National commercial online services, such as America Online, serve as ISPs and also provide subscribers with additional services, including access to extensive content within their own proprietary networks.

**Ways of Exchanging Information on the Internet**

38.    Users need not identify themselves to access much of the information available on the Internet.  Further, the user-names or e-mail addresses selected by many Internet users to log on to the Internet and communicate with other users often do not provide enough information to indicate users' real identities.  Indeed, many user-names are pseudonyms or pen names that

14

provide users with a distinct online identity and help preserve their anonymity and privacy. America Online, for example, allows every subscriber to use up to six different "screen names," which may be used for different family members or as separate pseudonyms for a single individual. The user-names and e-mail addresses are therefore often the only indicators of the users' identity; unless users choose to reveal other personal information, persons communicating with the user will know them only by their user-name and e-mail address.

39.     Once an individual signs on to the Internet, there are a wide variety of methods for communicating and exchanging information with other users, including e-mail, the World Wide Web, discussion groups, mailing lists, and chat rooms.

### E-Mail

40.     The simplest and perhaps most widely used method of communication on the Internet is via electronic mail, commonly referred to as "e-mail." Using one of dozens of available "mailers"—software capable of reading and writing e-mail—a user is able to address and transmit via computer messages containing or attaching images and text to a specific individual or group of individuals who have e-mail addresses.

### The World Wide Web

41.     The World Wide Web (the "Web") is the most popular way to provide and retrieve information on the Internet. Anyone with access to the Internet and proper software can create "Web pages" or "home pages" which may contain many different types of digital information—text, images, sound, and even video. The Web comprises millions of separate "Websites" that display content provided by particular persons or organizations. Any Internet user anywhere in the world with the proper software can create her own Web page, view Web

pages posted by others, and then read text, look at images and video, and listen to sounds posted at these sites.

42.     The Web serves in part as a global, online repository of knowledge, containing information from a diverse array of sources, which is easily accessible to Internet users around the world.  Though information on the Web is contained on individual computers, each of these computers is connected to the Internet through Web protocols that allow the information on the Web to become part of a single body of knowledge accessible by all Web users.

43.     Many large corporations, banks, brokerage houses, newspapers and magazines now provide online editions of their publications and reports on the Web or operate independent Websites.  Many government agencies and courts also use the Web to disseminate information to the public.  For example, defendant Attorney General Condon has posted an Internet Website containing information available to the public.  In addition, many individual users and small community organizations have established individualized home pages on the Web that provide information of interest to members of the particular organization, communities, and other individuals.

44.     Most Web documents also contain "links."  These are short sections of text or image that refer and link to another document.  Typically the linked text is blue or underlined when displayed, and when selected by the user on her computer screen, the referenced document is automatically displayed, wherever in the world it actually is stored.  Links, for example, are used to lead from overview documents to more detailed documents on the same Website, from tables of contents to particular pages, and from text to cross-references, footnotes, and other forms of information.  For example, the ABFFE web page provides links to several other Web pages also offered by the ABFFE, including those providing information on the "ABFFE Store"

and "Banned Books Week," as well as a page describing the ways in which new legislation may affect booksellers.

45.     Links may also take the user from the original Website to another Website on a different computer connected to the Internet, a computer that may be located in a different area of the country, or even other countries altogether.  For example, the AAP website includes links to resources elsewhere on the Web that are useful for book publishing, including the websites of the U.S. Copyright Office and the Book Industry Study Group.  While linking to these websites from the AAP website appears seamless from the user's point of view, in fact each of these websites are each located on entirely separate computers that are not maintained or controlled by the AAP.

46.     Through the use of these links from one computer to another, from one document to another, the Web for the first time unifies the diverse and voluminous information made available by millions of users on the Internet into a single body of knowledge that can be searched and accessed.

47.     A number of "search engines" and directories—such as Yahoo, Google, Alta Vista, WebCrawler, and Lycos—are available free of charge to help users navigate the World Wide Web.  Once a user has accessed the search service, he or she simply types a word or string of words as a search request and the search engine provides a list of sites that match the search string.  Many of these search engines also make it possible to search for images.

**Discussion Groups, Mailing Lists, and Chat Rooms**

48.     Online discussion groups are another of the most popular forms of communication via computer network.  Discussion groups allow users of computer networks to post messages containing or attaching images and text on a public computerized bulletin board

and to view and respond to messages posted by others in the discussion group. Discussion groups have been organized on many different computer networks and cover virtually every topic imaginable. Discussion groups can be formed by individuals, institutions or organizations, or by particular computer networks.

49.    "USENET" news groups are a very popular set of bulletin board discussion groups available on the Internet and other networks. Currently there are USENET news groups on more than 30,000 different subjects, and over 100,000 new messages are posted to these groups each day. Many newsgroups are specifically dedicated to posting various sorts of "binary files," such as images.

50.    Similarly, users also can communicate within a group by subscribing to automated electronic mailing lists that allow any subscriber to a mailing list to post a particular message containing or attaching images, text, web links, or some combination of the three, that is then automatically distributed to all of the other subscribers on that list. These lists are sometimes called "mail exploders" or "list servs."

51.    "Chat rooms" also allow users to engage in simultaneous conversations with another user or group of users by posting messages containing or attaching images and text, and viewing the messages posted by others participating in the "chat." Chat rooms are available on the Internet and on commercial online services. Although chat rooms are often set up by particular organizations or networks, any individual user can start an online "chat."

52.    Users of any of these methods of Internet communication can send or view images as well as text, and images are frequently distributed via these media to users throughout the world.

53.     Online discussion groups, mailing lists, and chat rooms create an entirely new global public forum—a cyberspace village green—where people can associate and communicate on every imaginable topic by means of words and images.

**The Range of Content Available on the Internet**

54.     The information made available on the Internet is as diverse as human thought. Content on the Internet is provided by the millions of Internet users worldwide, and the content ranges from academic writings, to humor, art, literature, medical information, music, news, movie clips, and human sexuality. For example, on the Internet one can view the full text of the Bible, all of the works of Shakespeare, and numerous other classic works of literature. One can browse through paintings from museums around the world, view in detail images of the ceiling of the Sistine Chapel, watch or download full-length motion pictures, or hear selections from the latest rap music albums. At any one time, the Internet serves as the communication medium for literally hundreds of thousands of international conversations, political debates, social dialogues, and exchanges of artwork. It is a global art museum, movie theater, bookstore, and Hyde Park.

55.     Although the overwhelming majority of the information on the Internet does not involve nudity or sexual activity, such material is available on the Internet. For example, an Internet user can view sixteenth-century Italian paintings of nude men or women, eighteenth-century Japanese erotic prints, and twentieth-century images and text discussing ways for married couples to improve their physical relationships, portraying methods of practicing safer sex, depicting the method for conducting a breast self-examination, or telling a story through comic book pages that have some sexual content. Much of this material is similar or identical to material that is routinely distributed through libraries, bookstores, record stores, and newsstands.

**The Act's Impact on Internet Speech**

56.     Because of the nature of the Internet, the Act bans constitutionally protected speech among adults.

57.     Speech on the Internet is generally available to anyone with access to this technology.  Anyone who posts content to the Web, chat rooms, mailing lists, and discussion groups makes it automatically available to all users worldwide.  Accordingly, minors have access to all of these forums.  Knowledge that the recipient is a minor is not required under the Act. Because of the very nature of the Internet, therefore, virtually every communication on the Internet may potentially be received or accessed by a minor.

58.     Most of the millions of users on the Internet are speakers and content providers subject to the Act.  Anyone who sends an e-mail, participates in a discussion group or chat room, or maintains a home page on the Web, might have that communication accessed by a minor in the State of South Carolina.

59.     Given the technology of the Internet, there are no reasonable means for these speakers to ascertain the age of persons who access their messages, or for restricting or preventing access by minors.  From the perspective of these speakers, the material  that they make available on the public spaces of the Internet either must be made available to all users of the Internet, including users who may be minors, or they will not be made available at all.

60.     For instance, when a user posts a message to a USENET discussion group, it is automatically distributed to hundreds of thousands of computers around the world, and the speaker has no ability to control who will access his or her message from those computers. Similarly, users who communicate on mailing lists have no way to determine the ages of other

subscribers to the list.  Finally, content providers on the Web have no reasonable way to verify

the age of persons who access their websites.  For these reasons, there is no practical way for

content providers to withhold material that may be "harmful to minors"—as prohibited by the

Act—from people younger than 18 years old, while still making that material available to adults.

61.     Moreover, the Act is overbroad because it allows prosecution even if the sender

had no knowledge or reason to know of the recipient's age.  Although knowledge of the

"character and content" of the material is required, knowledge that the recipient is a minor is not

required.

62.     Because Internet speakers have no means to restrict minors in South Carolina

from accessing their communications, the Act effectively requires almost all images on the

Internet—whether posted, sent, accessed, or received entirely by citizens of South Carolina or by

users anywhere in the world—to be at a level the Act deems suitable for young children.  The

Act therefore bans an entire category of constitutionally protected communication between and

among adults on the Internet.

63.     In addition, any person who disagrees with or objects to sexual content on the

Internet could cause a speaker to violate the Act and thereby render itself subject to prosecution

by having a minor view the online speech, resulting in a "heckler's veto" of Internet speech.

Further, any person who disagrees with sexual content on the Internet could cause a speaker to

fear prosecution under the Act by claiming to be a minor, whether or not the person actually is

one.

64.     Even if there were means by which speakers on the Internet could ascertain or

verify the age of persons who receive their content (and there are no such means), requiring users

21

to identify themselves and to disclose personal information in order to allow verification of age would prevent Internet users from maintaining their privacy and anonymity on the Internet.

**The Act's Burden on Interstate Commerce**

65.    The Act affects the speech of online speakers across the nation – not just in the State of South Carolina – because it is impossible for Internet users to determine the geographic location of persons who access their information, or to block access by those in a particular place.  Internet users outside the State of South Carolina have no way to determine whether material posted to the Web, discussion groups, or chat rooms will be accessed by persons in the State of South Carolina.  The various sites on the Internet can be accessed by anyone in the world; therefore, there is no way for speakers to ensure that people in South Carolina will not receive their communications.  Thus, all users, even if they do not reside in South Carolina or intend to communicate with residents of South Carolina, must comply with the Act.

66.    The Act thus unjustifiably burdens interstate commerce and regulates conduct that occurs wholly outside the State of South Carolina.  The Act chills speakers outside of South Carolina and curtails speech that occurs wholly outside the borders of South Carolina, thereby causing irreparable harm.  Like the nation's railways and highways, the Internet is by its nature an instrument of interstate commerce.  Just as goods and services travel over state borders by train and truck, information flows across state (and national) borders on the Internet.  Internet content providers that are located outside of South Carolina, such as certain members of ABFFE, SEBA, CBLDF, and the AAP, as well as people participating in chat rooms, newsgroups, or mail exploders, have no feasible way to determine whether their information will be accessed by someone who is located in South Carolina.  Because of the nature of the technology, a speaker outside South Carolina, even if he or she has no desire to reach anyone in South Carolina, will be

22

forced to self-censor his or her speech on the Internet in order to comply with the Act and avoid

the possibility that a minor from South Carolina will gain access to this information, thereby

subjecting the speaker to prosecution in South Carolina. Therefore, the Act interferes

significantly with the interstate flow of information and with interstate commerce.

67.    Moreover, interstate and international computer communications networks—like

the nation's railroads and highways—constitute an area of the economy and society that

particularly demands uniform rules and regulations. The states of New York, New Mexico,

Virginia, Vermont, Arizona, and Michigan previously enacted laws similar to the Act, which

were enjoined on Commerce Clause grounds because of the inconsistent obligations then

imposed on online speakers across the country. See Johnson, *supra* ¶ 2; Napolitano, *supra* ¶ 2;

Am. Booksellers Found. For Free Expression, *supra* ¶ 2; PSINet Inc., *supra* ¶ 2; Cyberspace

Communications, Inc., *supra* ¶ 2; Am. Libraries Ass'n., *supra* ¶ 2. The Act is infirm for the

same reasons.

68.    Because the definition of "harmful to minors" in S.C. CODE ANN. § 16-15-375(1)

depends in part upon the "contemporary community standards" of a jury in South Carolina, the

Act effectively imposes regulations on interstate speech that conflict with the community

standards of other States and their local communities. If each state implements its own

regulations, as South Carolina has done, regarding what information can be legally distributed

via this new technology, interstate commerce will be greatly inhibited and disrupted as persons

around the world try to discern what can and cannot be communicated in the many different

jurisdictions connected to these networks.

23

**The Ineffectiveness of the Act and the Effectiveness of Alternative Means**

69.     Because of the global nature of the Internet, defendants cannot demonstrate that the Act is likely to reduce the availability in South Carolina of material that may be "harmful to minors" on the Internet.

70.     A large percentage of the content provided on the Internet, perhaps 40% or more, originates outside the United States. ACLU v. Reno, 929 F. Supp. 824, 848 (E.D. Pa. 1996) (factual finding No. 117), aff'd, 521 U.S. 844 (1997).  All of the content on the global Internet is equally available to all Internet users worldwide and may be accessed as easily and as cheaply as content that originates locally.  Content providers located outside the United States have little or no incentive to comply with the content restrictions of the Act.  Because content posted abroad is available to Internet users in the State of South Carolina, the Act will not accomplish its purported purpose of keeping inappropriate content from minors in South Carolina.

71.     Conversely, there are many alternative means that are more effective at assisting parents in limiting a minor's access to certain material if desired.

72.     Commercial online services like America Online provide features that subscribers may use to prevent children from accessing chat rooms and to block access to websites and news groups based on keywords, subject matter, or specific newsgroup.  These services also offer screening software that blocks messages containing certain words, and tracking and monitoring software to determine which resources a particular online user, such as a child, has accessed.  They also offer children-only discussion groups that are closely monitored by adults.

73.     Online users also can purchase special software applications, known as user-based blocking programs, that enable them to control access to online resources.  These applications allow users to block access to certain resources, to prevent children from giving personal

24

information to strangers by e-mail or in chat rooms, and to keep a log of all online activity that occurs on the home computer.

74.    User-based blocking programs are not perfect, both because they fail to screen all inappropriate material and because they inadvertently block valuable Internet sites.  A voluntary decision by concerned parents to use these products for their children, however, constitutes a far less restrictive alternative than the Act's imposition of criminal penalties for protected speech upon the universe of Internet users.

**The Act's Impact on the Plaintiffs**

75.    The members of plaintiffs SEBA, PRINT STUDIO SOUTH, ABFFE, AAP, and CBLDF provide content over the Internet that could be deemed unlawful under the Act. Although many of these plaintiffs' members are organizations that operate on a national basis, their websites can be viewed in South Carolina, and they fear prosecution under the Act for communicating, sending, displaying, or distributing images that might be deemed by some to be "harmful to minors" under the Act.  Apart from self-censorship with respect to constitutionally protected images, SEBA, ABFFE, AAP, and CBLDF have no way to avoid the risk of prosecution under the Act.

76.    Plaintiff FAIC's members use the Internet to access a wide variety of content, including materials that contain nudity and other sexually explicit content and therefore could be deemed "harmful to minors" under the Act.  In aggregate, the Act threatens to reduce the material and discourse available over the Internet to that suitable only to young children.

25

## CAUSES OF ACTION

## COUNT I

### Violation of Adults' and Older Minors' Rights Under the
### First and Fourteenth Amendments of the United States Constitution

77.     Plaintiffs repeat and reallege paragraphs 1 – 76.

78.     The Act violates the rights of plaintiffs, their members, and their users under the First and Fourteenth Amendments of the United States Constitution because it effectively bans a substantial amount of constitutionally protected speech by and between adults, and by and between older minors.

79.     The Act violates the rights of plaintiffs, their members, and their users under the First and Fourteenth Amendments to the United States Constitution because it is not the least restrictive means of accomplishing any compelling governmental purpose, and because it is not narrowly tailored to accomplish any compelling governmental purpose.

80.     The Act violates the rights of plaintiffs, their members, and their users under First and Fourteenth Amendments to the United States Constitution because it is substantially overbroad.

## COUNT II

### Violation of the Right to Communicate and Access Information Anonymously
### Under the First and Fourteenth Amendments of the United States Constitution

81.     Plaintiffs repeat and reallege paragraphs 1–76.

82.     The Act violates the rights of plaintiffs, their members, and their users under the First and Fourteenth Amendments to the United States Constitution to communicate and access information anonymously, insofar as it effectively requires Internet users to identify themselves in order to gain access to constitutionally protected speech.

## COUNT III

### Violation of the Commerce Clause
### of the United States Constitution

83.     Plaintiffs repeat and reallege paragraphs 1–76.

84.     The Act violates the rights of plaintiffs, their members, and their users under the Commerce Clause because it regulates communications that take place wholly outside of the State of South Carolina.

85.     The Act violates the rights of plaintiffs, their members, and their users under the Commerce Clause because it constitutes an unreasonable and undue burden on interstate and foreign commerce.

86.     The Act violates the rights of plaintiffs, their members, and their users under the Commerce Clause because it subjects interstate use of the Internet to inconsistent regulations.

## COUNT IV

### Violation of 42 U.S.C. § 1983

87.     Plaintiffs repeat and reallege paragraphs 1–76.

88.     The Act deprives plaintiffs of their rights, privileges, and immunities secured by the First Amendment and the Commerce Clause of the United States Constitution in violation of 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully request that the Court:

A.     Declare that the Act violates the First and Fourteenth Amendments and the

        Commerce Clause of the United States Constitution;

27

B.    Permanently enjoin defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the Act;

C.    Award plaintiffs their reasonable costs and fees pursuant to 42 U.S.C. § 1988; and

D.    Grant plaintiffs such other and further relief as the Court deems just and proper.

Respectfully submitted,

HERBERT E. BUHL, III    I.D. No. 1564
AMERICAN CIVIL LIBERTIES UNION
OF SOUTH CAROLINA
533 Harden Street
Columbia, SC  29205
(803) 799-3767

DAVID W. OGDEN
JANIS C. KESTENBAUM
KENNETH A. BAMBERGER
WILMER, CUTLER & PICKERING
2445 M Street, N.W.
Washington, D.C.  20037
(202) 663-6000

MICHAEL A. BAMBERGER
SONNENSCHEIN NATH & ROSENTHAL
1221 Avenue of the Americas
New York, New York  10020
(212) 768-6700

*Attorneys for Plaintiffs*



HOME
REGISTER NOW
PRINT HTML ISSUE
HTML ARCHIVE
PDF ISSUE / ARCHIVE
TOPICAL INDEX
NO-ACTION LETTERS
CONFERENCES
SUBSCRIBE ONLINE
CONTACT US
PRIVACY POLICY
NEW
COMPLIANCE MANUAL

**Issue Date: November 04, 2002**

### SEC Enforcement Year in Review (Part 2 of 2)

*From the editors of IA Week*

SEC enforcement liaison **Barbara Chretien-Dar** recently discussed a number of significant SEC enforcement proceedings at an ALI-ABA conference (*IA Week, October 28, 2002*). Following her presentation, **Kirkpatrick & Lockhart LLP** partner **Richard Marshall** highlighted a number of additional significant SEC enforcement actions.

**Davis Select Advisers-NY, Inc.**

Background: The was the case where the SEC sued a fund for failing to disclose the overall effect of the fund's short-term trading in IPO securities, or "IPO flipping," on its periodic performance (*IA Week, September 9, 2002*).

"A fund has an obligation to disclose what is driving its performance numbers," said Chretien-Dar. "I think this case is actually very instructive as to what type of disclosure needs to be made when you discuss your performance."

She noted that over a two-year period, about 25 percent of the fund's performance was driven by the IPOs in the first year, and in the second year, the figure rose to over 50 percent. While the performance numbers used by the fund were accurate, Chretien-Dar pointed to an item in Form N-1A, which requires funds to discuss the factors that materially affected their performance during the past year, including relevant market conditions and the investment strategies and techniques used by the fund's adviser. "Twenty-five percent and 50 percent leave you as being material factors," she said.

She noted that while the fund discussed the impact of the performance of specific stocks, it did not discuss the IPO flipping. She also pointed out that while the IPO flipping was not prohibited by the fund's investment objective, the fund had traditionally invested for long-term growth, so it was "somewhat at loggerheads" with the fund's general investment objectives.

She emphasized that the SEC did not allege that the fund engaged in fraud. "Here, we did not have the hyping of the performance numbers to drive the fund's growth," said Chretien-Dar. "We did not view this as a fraud case, we really viewed it as a disclosure case." She noted that the case highlighted a

fund's continuing obligation to look at "what is behind its performance numbers."

The case "is not rulemaking by enforcement," she added. "The rule's already in place," she said, referring to the Form N-1A requirement that funds discuss material factors affecting their past year's performance.

"This is the second shoe of the hot IPO disclosure cases," observed **Richard Levan** of **Richard A. Levan and Associates**. The SEC's cases against **Van Kampen** and **Dreyfus**, he said, were "the first shoe." His recommendation: "Funds, advisers, and their counsel should be constantly reviewing and reconsidering their disclosures in this area."

### Renberg Capital Management, Inc.

Background: This was the case where an adviser was found to have failed to seek best execution because it crossed trades between tax-exempt and taxable client accounts. The adviser used a portfolio management technique called "repositioning," in which securities purchased by tax-exempt accounts were moved to taxable accounts through cross trades for tax reasons. The repositioning practice was not disclosed to clients (*IA Week*, October 7, 2002).

Marshall noted that the SEC accused Renberg of systematically favoring the tax-exempt accounts without disclosing that practice. "The facts are complicated, but I think there is an important message there," he said. In reading the case, Marshall said he thought of a practice that is "universally practiced" in the investment advisory business: directed brokerage. When an adviser has both directed and non-directed accounts, "which part gets executed first? The non-directed business." That means the directed business comes last, explained Marshall, and "probably doesn't get as good of execution."

The question of whether an adviser failed to seek best execution by executing directed trades after non-directed trades is the subject of litigation against an Atlanta-based adviser, **Montag & Caldwell** (*IA Week,* August 19, 2002).

### Vanderbilt Capital Advisors LLC

Background: This was the case where an adviser was found to have failed to supervise a portfolio manager who engaged in "adjusted trading" with a registered representative of a broker-dealer. The portfolio manager caused a number of favored advisory accounts to sell bonds to the broker-dealer at above-market prices, and then subsequently bought those bonds back, at lower prices, for a second group of disfavored accounts. To offset the broker-dealer's resulting loss, the portfolio manager caused the disfavored accounts to buy different bonds from the broker-dealer at above-market prices (*IA Week*, September 9, 2002).

"Vanderbilt was one of the weirder allocation cases that I've seen," said

Marshall. He pointed out that "we now have four cases that involve a scheme between someone at the adviser and someone at a broker to inflate the value of securities held in clients accounts," said Marshall. He referred to last year's Legg Mason case, and the Friedlander and Oechsle window-dressing cases, where an adviser and a broker manipulated the prices right before the market close to inflate prices.

Marshall said that he's been asked by clients, "What should we do to stop this?" A conspiracy between someone at an adviser and someone at a broker to put "phony" prices on securities through various schemes is "a real tough one," he said. At the end of the day, he explained, it all comes back to valuation. "It comes back to taking a skeptical look at arrangements where small, relatively unknown brokers are being used for very significant transactions, very sensitive periods such as end of reporting periods." Ultimately, explained Marshall, "they are valuation cases, [and are] very tough to police."

Levan provided some suggestions: "Test, survail, and review." Said Levan: "You can't catch all the wrongdoers all the time, but in this day and age I do think that advisers would be well served to have a formal surveillance program for traders that they could point to."

The goal, he explained, is not to review 100 percent of all trades, and a firm need not spend "half a million dollars on a new software system." Advisers can just sample trades in particular areas, depending on the firm's structure, types of trading, and areas of perceived risk. "The goal is to be able to demonstrate to a regulator that you took reasonable steps to ensure that securities were being properly priced and that the traders weren't abusing their latitude," said Levan. He noted that having some type of surveillance system in place also will serve advisers well in terms of dealing litigants and arbitrators.

**Schwendiman Partners LLC**

Background: This was the case where two brothers who ran hedge funds were found to have taken limited investment opportunities belonging to the funds, to have not treated clients fairly, and to have failed to follow the terms of the funds' LLC agreements (*IA Week*, July 22, 2002).

Marshall pointed out that the SEC sued the Schwendimans for failing to follow the terms of their funds' LLC agreement by treating certain transactions as redemptions, which meant that there was something left at the end for the general partners, instead of liquidations. "You might say, why is it the SEC's business to police compliance with limited partnership agreements?" The SEC turned it into a fraud case, explained Marshall.

**Portfolio Advisory Services LLC**

Background: This was the case where an adviser was found to have failed to seek best execution by interpositioning referring brokers. The adviser agreed

to direct commissions to five referring brokers, in return for their referring investors to the hedge fund (*IA Week*, July 1, 2002).

"This is a hedge fund that basically wanted to put some money in the pockets of brokers who referred investors," said Marshall. To accomplish this, the hedge fund did a trade and instructed the broker through whom they traded to "send a check to the other broker who referred the business. Marshall noted that the SEC said that that was improper and should have been disclosed. "I think it is a very complex and interesting question as to how that is different from an introducing-executing arrangement," said Marshall. "My understanding is that if the referring broker was an introducing broker, the arrangement is okay. But if all you do is send a check, that's not okay."

**Performance Analytics, Inc.**

Background: This was the case where a pension consultant was involved in a multi-party kickback scheme. The pension consultant was found by the SEC to have entered into an oral agreement with a plan trustee to recommend to the plan only those advisers that had agreed to direct brokerage to a broker-dealer who would send commission kickbacks to the trustee (*IA Week*, June 24, 2002).

Performance Analytics previously had been sued for aiding and abetting the dissemination of false performance information by **Merrimac Advisors Company** (*IA Week*, October 15, 2001).

"The consulting industry - both in terms of disseminating performance information and in this whole kind of mutual hand washing business that they engaged in - is now on [the SEC's] radar screen," said Marshall.

**Categories:**  Enforcement, SEC Actions

print article

Copyright 2001 UCG. All rights reserved. Do not duplicate or redistribute in any form.
*IA Week* is available for internal use only by authorized users.
UCG/*IA Week*, 11300 Rockville Pike, Suite 1100, Rockville, MD20852.
phone:301/287-2208 fax: 301/287-2195

## Eckert, Paul

| | |
|---|---|
| **From:** | Berry, William [WBerry@SheaGardner.com] |
| **Sent:** | Friday, November 01, 2002 3:07 PM |
| **To:** | Eckert, Paul |
| **Subject:** | RE: Docs to be copied |

Sorry about that.

Here's the list.

TYCO docs:

014625
014661
010927
010875
010821
010758
029289
029294
014786
015189-015191
036418
036578
036422
036342
014776
014782
014787
014786
014775
014625
065338
057785
057886
029286
005996
029809
029810
039431-039432
059965
029705-029706
029711-029713
087180
087351-087353
086913
008767
082348
086844
014637
087660
026118
089561-089586
014983
014637
026096

11/1/2002

096471
026151
096472
096473
057785-057786
032398
029706
029711-029714
011561-011564
032400

There is someone here until 7 pm tonight and then from 10 until 2pm tomorrow.  Please have the copies
couriered over.

Thanks,

Will

## CODE OF LAWS OF SOUTH CAROLINA 1976 ANNOTATED
### TITLE 16. CRIMES AND OFFENSES
### CHAPTER 15. OFFENSES AGAINST MORALITY AND DECENCY
### ARTICLE 3. OBSCENITY, MATERIAL HARMFUL TO MINORS, CHILD EXPLOITATION, AND CHILD PROSTITUTION

COPYRIGHT © 2002 BY THE STATE OF SOUTH CAROLINA

Current through End of 2001 Reg. Sess.

§ 16-15-375. Definitions applicable to §§ 16-15-385 through 16-15-425.

The following definitions apply to Section 16-15-385, disseminating or exhibiting to minors harmful material or performances;  Section 16-15-387, employing a person under the age of eighteen years to appear in a state of sexually explicit nudity in a public place;  Section 16-15-395, first degree sexual exploitation of a minor;  Section 16-15-405, second degree sexual exploitation of a minor;  Section 16-15-410, third degree sexual exploitation of a minor;  Section 16-15-415, promoting prostitution of a minor;  and Section 16-15-425, participating in prostitution of a minor.

(1) "Harmful to minors" means that quality of any material or performance that depicts sexually explicit nudity or sexual activity and that, taken as a whole, has the following characteristics:

(a) the average adult person applying contemporary community standards would find that the material or performance has a predominant tendency to appeal to a prurient interest of minors in sex;  and

(b) the average adult person applying contemporary community standards would find that the depiction of sexually explicit nudity or sexual activity in the material or performance is patently offensive to prevailing standards in the adult community concerning what is suitable for minors;  and

(c) to a reasonable person, the material or performance taken as a whole lacks serious literary, artistic, political, or scientific value for minors.

(2) "Material" means pictures, drawings, video recordings, films, digital electronic files, or other visual depictions or representations but not material consisting entirely of written words.

(3) "Minor" means an individual who is less than eighteen years old.

(4) "Prostitution" means engaging or offering to engage in sexual activity with or for another in exchange for anything of value.

(5) "Sexual activity" includes any of the following acts or simulations thereof:

(a) masturbation, whether done alone or with another human or animal;

(b) vaginal, anal, or oral intercourse, whether done with another human or an animal;

(c) touching, in an act of apparent sexual stimulation or sexual abuse, of the clothed or unclothed genitals, pubic area, or buttocks of another person or the clothed or unclothed breasts of a human female;

(d) an act or condition that depicts bestiality, sado-masochistic abuse, meaning flagellation or torture by or upon a person who is nude or clad in undergarments or in a costume which reveals the pubic hair, anus, vulva, genitals, or female breast nipples, or the condition of being fettered, bound, or otherwise physically restrained on the part of the one so clothed;

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

ATTACHMENT
\

(e) excretory functions;

(f) the insertion of any part of a person's body, other than the male sexual organ, or of any object into another person's anus or vagina, except when done as part of a recognized medical procedure.

(6) "Sexually explicit nudity" means the showing of:

(a) uncovered, or less than opaquely covered human genitals, pubic area, or buttocks, or the nipple or any portion of the areola of the human female breast; or

(b) covered human male genitals in a discernibly turgid state.

HISTORY: 1987 Act No. 168 § 3, eff October 1, 1987; 1991 Act No. 73, § 2, eff May 22, 1991; 1994 Act No. 421, § 2, eff May 19, 1994; 2001 Act No. 81, § 10, eff July 20, 2001.

<General Materials (GM) - References, Annotations, or Tables>

EDITOR'S NOTE--

**1987 Act No. 168, § 5,** provides as follows:

"All proceedings pending and rights and liabilities existing, acquired, or incurred at the time this act takes effect are saved and may be consummated according to the law in force when they were commenced. This act may not be construed to affect any prosecution pending or begun before the effective date of this act."

EFFECT OF AMENDMENT--

The **1991** amendment, in the first paragraph, added § 16-15-410 to the list of sections to which the definitions in this section apply.

The **1994** amendment, in the first paragraph, added § 16-15-387 to the list of sections to which the definitions in this section apply.

The **2001** amendment in paragraph (2) inserted "digital electronic files,"; and made a spelling change in item (6)(b).

**CROSS REFERENCES--**

Commission of this crime within specified radius of child day care center as separate offense, see § 20-7-3095.

**RESEARCH AND PRACTICE REFERENCES--**

50 Am Jur 2d, Lewdness, Indecency, and Obscenity § § 1-15.
10 Am Jur Trials, Obscenity Litigation, 1-254.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

SC ST § 16-15-375                                                    Page 3
 Code 1976 § 16-15-375

 67 C.J.S., Obscenity §§ 1-7.

ANNOTATIONS--

 Applicability of criminal statutes relating to offenses against children of a specified age with respect to a child who
has passed the anniversary date of such age, 73 ALR2d 874.
 Modern concept of obscenity, 5 ALR3d 1158.
 Supreme Court's development, since Roth v United States, of standards and principles determining concept of
obscenity in context of right of free speech and press, 41 L Ed 2d 1257.

Code 1976 § 16-15-375

SC ST § 16-15-375

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

SC ST § 16-15-385                                                          Page 1
 Code 1976 § 16-15-385

### CODE OF LAWS OF SOUTH CAROLINA 1976 ANNOTATED
### TITLE 16. CRIMES AND OFFENSES
### CHAPTER 15. OFFENSES AGAINST MORALITY AND DECENCY
### ARTICLE 3. OBSCENITY, MATERIAL HARMFUL TO MINORS, CHILD EXPLOITATION, AND CHILD PROSTITUTION

COPYRIGHT © 2002 BY THE STATE OF SOUTH CAROLINA

Current through End of 2001 Reg. Sess.


§ 16-15-385. Disseminating harmful material to minors and exhibiting harmful performance to minor defined; defenses; penalties.


 (A) A person commits the offense of disseminating harmful material to minors if, knowing the character or content of the material, he:

 (1) sells, furnishes, presents, or distributes to a minor material that is harmful to minors;  or

 (2) allows a minor to review or peruse material that is harmful to minors.

 A person does not commit an offense under this subsection when he employs a minor to work in a theater if the minor's parent or guardian consents to the employment and if the minor is not allowed in the viewing area when material harmful to minors is shown.

 (B) A person commits the offense of exhibiting a harmful performance to a minor if, with or without consideration and knowing the character or content of the performance, he allows a minor to view a live performance which is harmful to minors.

 (C) Except as provided in item (3) of this subsection, mistake of age is not a defense to a prosecution under this section.  It is an affirmative defense under this section that:

 (1) the defendant was a parent or legal guardian of a minor, but this item does not apply when the parent or legal guardian exhibits or disseminates the harmful material for the sexual gratification of the parent, guardian, or minor.

 (2) the defendant was a school, church, museum, public, school, college, or university library, government agency, medical clinic, or hospital carrying out its legitimate function, or an employee or agent of such an organization acting in that capacity and carrying out a legitimate duty of his employment.

 (3) before disseminating or exhibiting the harmful material or performance, the defendant requested and received a driver's license, student identification card, or other official governmental or educational identification card or paper indicating that the minor to whom the material or performance was disseminated or exhibited was at least eighteen years old, and the defendant reasonably believed the minor was at least eighteen years old.

 (D) A person who violates this section is guilty of a felony and, upon conviction, must be imprisoned not more than five years or fined not more than five thousand dollars, or both.


HISTORY:  1987 Act No. 168 § 3, eff October 1, 1987;  1990 Act No. 358, § § 1, 2, eff March 19, 1990;  1993 Act No. 184, § 34, eff January 1, 1994.


<General Materials (GM) - References, Annotations, or Tables>

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

EDITOR'S NOTE--

**1987 Act No. 168, § 5,** provides as follows:

"SECTION 5. All proceedings pending and rights and liabilities existing, acquired, or incurred at the time this act takes effect are saved and may be consummated according to the law in force when they were commenced. This act may not be construed to affect any prosecution pending or begun before the effective date of this act."

EFFECT OF AMENDMENT--

The **1990** amendment added the second paragraph in subsection (A), and in subsection (C)(2), inserted ", school, college, or university" before "library".

The **1993** amendment rewrote subsection (D) so as to change portions from misdemeanors to felonies and the maximum term of imprisonment to conform to the new crime classification system.

**CROSS REFERENCES--**

Classification of offense specified in this section as Class F felony, see § 16-1-90(F).

Definitions applicable this section, see § 16-15-375.

Prohibition against the appointment of any person convicted under this section as guardian ad litem for a child in an abuse or neglect proceeding, see § 20-7-123.

Foster care placement may not be made with person convicted of, or who has pled guilty or nolo contender to, Offense Against Morality or Decency as provided for in this Chapter, see § 20-7-1642.

Fingerprint review of any person applying to operate or seek employment at a child day care or group day care home to determine prior conviction of the crime referred to in this section, see § 20-7-2800.

As to denial of renewal for child day care or group day care home where the person applying for approval, the operator of the facility, or an employee or caregiver has been convicted of the crime referred to in this section, see § 20-7-2810.

As to denial of registration as an operator of a child day care or group day care home where the applicant, an employee, or caregiver has been convicted of the crime referred to in this section, see § 20-7-2850.

No license or registration will be issued to any religious establishment to operate a child day care or group day care home where the operator, an employee, or caregiver has been convicted of the crime referred to in this section, see § 20-7-2900.

Commission of this crime within specified radius of child day care center as separate offense, see § 20-7-3095.

No person may be employed by the Department of Social Services in its day care licensing or child protective services divisions who has been convicted of the crime referred to in this section, see § 20-7-3097.

**RESEARCH AND PRACTICE REFERENCES--**

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

50 Am Jur 2d, Lewdness, Indecency, and Obscenity § § 20-24, 26.
10 Am Jur Trials, Obscenity Litigation, 1-254.
67 C.J.S., Obscenity § § 13-19.

## ANNOTATIONS--

Applicability of criminal statutes relating to offenses against children of a specified age with respect to a child who has passed the anniversary date of such age, 73 ALR2d 874.

Modern concept of obscenity, 5 ALR3d 1158.

Exhibition of obscene motion pictures as nuisance, 50 ALR3d 969.

Validity and construction of statute or ordinances forbidding treatment in health clubs or massage salons by persons of the opposite sex, 51 ALR3d 936.

Pornoshops or similar places disseminating obscene materials as nuisance, 58 ALR3d 1134.

Validity, construction, and effect of statutes or ordinances prohibiting the sale of obscene materials to minors, 93 ALR3d 297.

In personam or territorial jurisdiction of state court in connection with obscenity prosecution of author, actor, photographer, publisher, distributor, or other party whose acts were performed outside the state, 16 ALR4th 1318.

Validity and application of statute exempting nonmanagerial nonfinancially interested employees from obscenity prosecution, 35 ALR4th 1237.

Supreme Court's development, since Roth v United States, of standards and principles determining concept of obscenity in context of right of free speech and press. 41 L Ed 2d 1257.

## ATTORNEY GENERAL'S OPINIONS

### 1. In General

Inasmuch as present statutes may prohibit the display of certain bumper stickers which are obscene, as defined by State law, consideration may be given to utilizing the statutes already enacted to prevent the display of offensive bumper stickers attached to motor vehicles. 1989 Op Atty Gen, No. 89-1, p 18.

Code 1976 § 16-15-385

SC ST § 16-15-385

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2001 Act 81 (Relevant Excerpts)

(A81, R157, H3891)

**AN ACT TO AMEND SECTION 20-7-2735, CODE OF LAWS OF SOUTH CAROLINA, 1976, RELATING TO EDUCATIONAL REQUIREMENTS FOR CERTAIN CHILD DAYCARE CAREGIVERS, SO AS TO ALLOW CAREGIVERS PREVENTED FROM MEETING THE EDUCATIONAL REQUIREMENTS DUE TO A DISABILITY TO SATISFY THIS REQUIREMENT WITH A CERTIFICATE OF HIGH SCHOOL COMPLETION AND TO EXEMPT CERTAIN OTHER CAREGIVERS FROM THIS REQUIREMENT; TO AMEND SECTION 16-16-20, AS AMENDED, RELATING TO COMPUTER CRIMES, SO AS TO REDUCE FROM TWENTY-FIVE THOUSAND DOLLARS TO FIVE THOUSAND DOLLARS THE AMOUNT OF GAIN THE OFFENDER RECEIVES OR THE AMOUNT OF LOSS THE VICTIM SUFFERS FOR COMPUTER CRIME IN THE FIRST DEGREE AND TO ALSO REDUCE FROM TWENTY-FIVE THOUSAND DOLLARS TO FIVE THOUSAND DOLLARS THE MAXIMUM GAIN OR LOSS REQUIRED FOR COMPUTER CRIME IN THE SECOND DEGREE; TO AMEND SECTION 16-3-850, RELATING TO REQUIRING FILM PROCESSORS TO REPORT TO LAW ENFORCEMENT A PERSON WITH FILM CONTAINING SEXUALLY EXPLICIT PICTURES OF MINORS, SO AS TO ALSO REQUIRE COMPUTER TECHNICIANS WHO VIEW SUCH IMAGES WHEN WORKING ON A COMPUTER TO REPORT THE OWNER OR PERSON IN POSSESSION OF THE COMPUTER; TO AMEND SECTION 16-3-1700, RELATING TO DEFINITIONS USED IN CONNECTION WITH HARASSMENT AND STALKING, SO AS TO INCLUDE WRITTEN AND ELECTRONIC CONTACT WITH VICTIMS WITHIN THE DEFINITIONS OF "HARASSMENT" AND "STALKING"; TO AMEND SECTION 16-14-20, AS AMENDED, RELATING TO FINANCIAL TRANSACTION CARD THEFT, SO AS TO ALSO INCLUDE IN SUCH THEFT THE TAKING, USING, OR SELLING OF A FINANCIAL TRANSACTION CARD NUMBER; TO AMEND SECTION 16-15-250, AS AMENDED, RELATING TO COMMUNICATING OBSCENE MESSAGES, SO AS TO INCLUDE COMMUNICATING BY PRINT OR TELEPHONE**

OR BY TRANSMITTING A DIGITAL ELECTRONIC FILE; AND TO AMEND SECTION 16-15-305, AS AMENDED, RELATING TO DISSEMINATION OF OBSCENITY, SO AS TO ALSO PROHIBIT THE DISSEMINATION OF AN OBSCENE DIGITAL ELECTRONIC FILE; TO AMEND SECTION 16-15-315, RELATING TO THE PROHIBITION AGAINST CONDITIONING SALES OF PUBLICATIONS ON THE PURCHASER RECEIVING OBSCENE PUBLICATIONS FOR RESALE, SO AS TO ALSO APPLY THE PROHIBITION TO THE SALE OR RECEIPT OF DIGITAL ELECTRONIC FILES; TO AMEND SECTION 16-15-325, RELATING TO PROHIBITING PARTICIPATION IN PREPARING OBSCENE MATERIAL FOR DISSEMINATION, SO AS TO ALSO PROHIBIT THE PREPARATION OF OBSCENE DIGITAL ELECTRONIC FILES; TO AMEND SECTION 16-15-375, AS AMENDED, RELATING TO DEFINITIONS USED IN CONNECTION WITH OBSCENE MATERIAL AND MINORS, SO AS TO INCLUDE DIGITAL ELECTRONIC FILES WITHIN THE DEFINITION OF "MATERIAL"; TO AMEND SECTION 16-15-395 AND SECTION 16-15-405, AS AMENDED, RELATING, RESPECTIVELY, TO FIRST DEGREE AND SECOND DEGREE SEXUAL EXPLOITATION OF A MINOR, SO AS TO INCLUDE IN THE FIRST DEGREE OFFENSE KNOWINGLY PRODUCING FOR SALE OR PECUNIARY GAIN A DIGITAL ELECTRONIC FILE CONTAINING A VISUAL REPRESENTATION OF A MINOR ENGAGED IN SEXUAL ACTIVITY AND IN THE SECOND DEGREE OFFENSE KNOWINGLY PRODUCING SUCH A FILE; TO AMEND SECTION 16-17-430, AS AMENDED, RELATING TO UNLAWFUL USE OF TELEPHONES, SO AS TO ALSO PROHIBIT CONTACTS BY ANY OTHER ELECTRONIC MEANS AND TO CHANGE FELONY VIOLATIONS TO MISDEMEANOR VIOLATIONS WITH REVISED PENALTIES; TO AMEND SECTION 16-17-470, AS AMENDED, RELATING TO EAVESDROPPING, PEEPING, AND VOYEURISM, SO AS TO INCLUDE IN THE CRIME OF VOYEURISM PRODUCING OR CREATING DIGITAL ELECTRONIC FILES, TO INCLUDE IN THE CRIME OF AGGRAVATED VOYEURISM KNOWINGLY SELLING OR DISTRIBUTING DIGITAL ELECTRONIC FILES, AND TO REQUIRE FORFEITURE OF THESE DIGITAL ELECTRONIC FILES; TO AMEND SECTION 16-17-640, RELATING TO BLACKMAIL, SO AS TO INCLUDE ELECTRONIC COMMUNICATIONS WITHIN THE

2

**PROHIBITED MEANS OF COMMITTING BLACKMAIL; AND TO AMEND SECTION 20-7-510, AS AMENDED, RELATING TO REPORTING CHILD ABUSE OR NEGLECT, SO AS TO REQUIRE COMPUTER TECHNICIANS TO REPORT IF THE PERSON HAS REASON TO BELIEVE THAT A CHILD'S PHYSICAL OR MENTAL HEALTH OR WELFARE HAS BEEN OR MAY BE ADVERSELY AFFECTED BY ABUSE OR NEGLECT.**

Be it enacted by the General Assembly of the State of South Carolina:

\* \* \*

### Definitions

SECTION 10.  Section 16-15-375 of the 1976 Code, as last amended by Act 421 of 1994, is further amended to read:

"Section 16-15-375. The following definitions apply to Section 16-15-385, disseminating or exhibiting to minors harmful material or performances; Section 16-15-387, employing a person under the age of eighteen years to appear in a state of sexually explicit nudity in a public place; Section 16-15-395, first degree sexual exploitation of a minor; Section 16-15-405, second degree sexual exploitation of a minor; Section 16-15-410, third degree sexual exploitation of a minor; Section 16-15-415, promoting prostitution of a minor; and Section 16-15-425, participating in prostitution of a minor.

(1)  'Harmful to minors' means that quality of any material or performance that depicts sexually explicit nudity or sexual activity and that, taken as a whole, has the following characteristics:

(a)  the average adult person applying contemporary community standards would find that the material or performance has a predominant tendency to appeal to a prurient interest of minors in sex; and

(b)  the average adult person applying contemporary community standards would find that the depiction of sexually explicit nudity or sexual activity in the material or performance is patently offensive to prevailing standards in the adult community concerning what is suitable for minors; and

3

(c)  to a reasonable person, the material or performance taken as a whole lacks serious literary, artistic, political, or scientific value for minors.

(2)  'Material' means pictures, drawings, video recordings, films, digital electronic files, or other visual depictions or representations but not material consisting entirely of written words.

(3)  'Minor' means an individual who is less than eighteen years old.

(4)  'Prostitution' means engaging or offering to engage in sexual activity with or for another in exchange for anything of value.

(5)  'Sexual activity' includes any of the following acts or simulations thereof:

(a)  masturbation, whether done alone or with another human or animal;

(b)  vaginal, anal, or oral intercourse, whether done with another human or an animal;

(c)  touching, in an act of apparent sexual stimulation or sexual abuse, of the clothed or unclothed genitals, pubic area, or buttocks of another person or the clothed or unclothed breasts of a human female;

(d)  an act or condition that depicts bestiality, sado-masochistic abuse, meaning flagellation or torture by or upon a person who is nude or clad in undergarments or in a costume which reveals the pubic hair, anus, vulva, genitals, or female breast nipples, or the condition of being fettered, bound, or otherwise physically restrained on the part of the one so clothed;

(e)  excretory functions;

(f)  the insertion of any part of a person's body, other than the male sexual organ, or of any object into another person's anus or vagina, except when done as part of a recognized medical procedure.

(6)  'Sexually explicit nudity' means the showing of:

(a)  uncovered, or less than opaquely covered human genitals, pubic area, or buttocks, or the nipple or any portion of the areola of the human female breast; or

(b)  covered human male genitals in a discernibly turgid state.''

* * *

**Time effective**

SECTION  17.  This act takes effect upon approval by the Governor.

4

Ratified the 28th day of June, 2001.

Approved the 20th day of July, 2001.

————