IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

|  |  |  |
|---|---|---|
| Southeast Booksellers Association, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. 2:02-3747-23 |
| | ) | **ORDER** |
| Henry D. McMaster, Attorney General of South Carolina, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

In this action, Plaintiffs have brought a pre-enforcement constitutional challenge to permanently enjoin the operation of S.C. Code § 16-15-375, which provides criminal sanctions for "disseminating harmful material to minors." *See* S.C. Code Ann. § 16-15-375; S.C. Code Ann. § 16-15-385 (collectively hereinafter "the Act"). The parties are now before the court upon cross motions for summary judgment. Having throughly considered the parties' submissions, the oral arguments, the applicable law, and the entire documented record, the court grants Plaintiffs' motion for summary judgment, and denies Defendants' motion.

**BACKGROUND**

Plaintiffs, with the exception of Families Against Internet Censorship ("FAIC"),[1] are organizations that represent artists, writers, booksellers, and publishers who use the Internet to engage in expression, including graphic arts, literature, and health-related information. Most

---

[1] FAIC is an organization that represents families with Internet access and at least one child. These families are advocates of the right to "acquire educational and artistic material" via the Internet. (Compl. ¶ 10.) FAIC fights against government regulation and censorship of Internet content, arguing that parents should have ultimate authority over the content to which their children are exposed on the Internet.

of these organizations maintain their own websites which contain resources on obstetrics, gynecology, and sexual health; visual art and poetry; and other speech which could be considered "harmful to minors" in some communities under the Act, despite the fact that their speech is constitutionally protected as to adults.

The Act provides criminal sanctions for "disseminating harmful material to minors." The term "harmful to minors" is defined by S.C. Code Ann. § 16-15-375(1), which provides:

> "Harmful to minors" means that quality of any material or performance that depicts sexually explicit nudity or sexual activity and that, taken as a whole, has the following characteristics:
> (a) the average adult person applying contemporary community standards would find that the material or performance has a predominant tendency to appeal to a prurient interest of minors in sex; and
> (b) the average adult person applying contemporary community standards would find that the depiction of sexually explicit nudity or sexual activity in the material or performance is patently offensive to prevailing standards in the adult community concerning what is suitable for minors; and
> (c) to a reasonable person, the material or performance taken as a whole lacks serious literary, artistic, political, or scientific value for minors.

S.C. Code Ann. § 16-15-375.  A violation of § 16-15-375 is a felony, punishable by up to five years in prison, a fine of $5,000, or both.  *See* S.C. Code Ann. § 16-15-385.

The controversy in this case centers primarily around an amendment to the Act, signed by former Governor Jim Hodges on July 20, 2001, which added the following definition of "material":

> "Material" means pictures, drawings, video recordings, films, *digital electronic files, or other visual depictions or representations* but not material consisting entirely of written words."

S.C. Code § 16-15-375 (2) (emphasis added).  Pursuant to this amendment, the Act proscribes the dissemination to minors of obscene "digital electronic files."

Plaintiffs allege that this proscription violates the First Amendment and the Commerce

Clause because it prohibits adults, and even older minors, from viewing and sending constitutionally-protected images over the Internet and has the effect of prohibiting constitutionally-protected communications nationwide. (Compl. ¶ ¶ 1; 78-81; 84-86).  With respect to their First Amendment claim, Plaintiffs argue that the Act, as a content-based restriction on speech, cannot survive strict scrutiny and is unconstitutionally overbroad because it substantially infringes on protected speech of adults.   As for their Commerce Clause arguments, Plaintiffs contend that the proscription constitutes an unreasonable and undue burden on interstate and foreign commerce and subjects interstate use of the Internet to inconsistent state regulation.  (Compl. ¶ ¶ 84-86)

## PROCEDURAL HISTORY

On February 6, 2003, Defendants moved to dismiss the action, arguing that Plaintiffs lacked standing to pursue their First Amendment and Commerce Clause challenges.  Defendants also argued that the Complaint was subject to dismissal for failure to state a claim upon which relief could be granted because the statute, properly construed, did not violate either the First Amendment or the Commerce Clause.  Following a hearing, the court considered and rejected each of Defendants' arguments.  *See Southeast Booksellers v. McMaster,* 282 F.Supp.2d 389 (D.S.C. 2003).

Shortly thereafter, both sides moved for summary judgment.  This court held the cross-motions for summary judgment in abeyance pending the United States Supreme Court's decision in *Ashcroft v. ACLU*, 124 S. Ct. 2783 (2004), due to the similarities between the relevant provisions of the Child Online Protection Act ("COPA"), which were under review in *Ashcroft*, and those at issue in the present action.  On June 29, 2004, the Supreme Court issued its opinion

3

in *Ashcroft*. Finding the pending summary judgment motions ripe for adjudication after *Ashcroft,* the court issued its ruling denying summary judgment to both sides on July 6, 2004.[2]

In the July 6, 2004 ruling, the court denied Defendants' motion for summary judgment on the basis that Defendants simply reasserted arguments previously addressed and rejected by the court at the motion to dismiss stage. The court concluded that there was no basis to disturb its previous disposition of those arguments. With respect to Plaintiffs' motion, the court concluded that summary judgment was inappropriate under the reasoning of *Ashcroft*. Specifically, the court denied summary judgment pursuant to the *Ashcroft* Court's admonition that a full trial on the merits might be necessary before a court could rule on the constitutionality of a statute such as the one at issue in order to allow for adequate development of the record with respect to the question of plausible, less restrictive alternatives. At the time of the court's July 6th Order, the record simply did not contain sufficient evidence regarding the effectiveness of less restrictive alternatives vis-a-vis the challenged statute.

On October 7, 2004, Plaintiffs filed an updated motion for summary judgment including the Supplemental Expert Declaration of Dr. Lorrie Faith Cranor ("Cranor Declaration"), in which Cranor discusses relevant facts concerning the operation of the Internet, the current state of Internet technology, and technological alternatives to the South Carolina statute. On November 24, 2004, Defendants filed their updated motion for summary judgment, including a Declaration of Dr. Dan R. Olsen, Jr ("Olsen Declaration"), who, like Cranor, offers a factual

---

[2] After the court's denial of the summary judgment motions, Defendants requested that the court hold the case in abeyance "until such time as a final decision is reached in [sic] *ACLU v. Ashcroft* on remand and on any subsequent review by the Court of Appeals for the Third Circuit and the United States Supreme Court." (Def. Motion for Stay or to Hold in Abeyance at 1). The court denied this request on October 13, 2004.

4

account of pertinent Internet technology. Through these expert declarations, both parties attempt to answer the question of whether the restriction at issue is the least restrictive means of furthering the goals of the statute.

## ANALYSIS

In seeking summary judgment on their First Amendment claim, Plaintiffs argue that the Act fails strict scrutiny because Defendants have failed to prove that the Act is the least restrictive means of preventing minors from using the Internet to access materials deemed harmful to them. Moreover, Plaintiffs contend that the Supreme Court's ruling in *Ashcroft* does not require a full trial on the merits, where, as here, Defendants have failed to present adequate evidence demonstrating that the Act is the least restrictive alternative. Finally, Plaintiffs argue that their Commerce Clause claim is squarely governed by *PSINet, Inc. v. Chapman,* 362 F.3d 227, 239-240 (4th Cir. 2004), in which the Fourth Circuit held that a Virginia law criminalizing the dissemination of material harmful to minors over the Internet violated the Commerce Clause.

Defendants, on the other hand, argue that summary judgment in their favor is appropriate because they have "shown that South Carolina's restrictions on dissemination of harmful material to minors does not unduly burden adults' access to protected speech," and because "the alternatives suggested by the Plaintiffs are not less restrictive." (Def. Mem. at 1). Defendants then argue that they are entitled to summary judgment on the Commerce Clause claims because they have shown that South Carolina's restrictions on dissemination of harmful material to minors does not burden commerce.

The court begins by considering the First Amendment claim, and in particular, by explaining the *Ashcroft* holding and its import on the matter *sub judice*. The court then

considers whether the Act violates the Commerce Clause.

I.      **The First Amendment Claim**

A.      **The Ashcroft Holding**

In *Ashcroft*, the Supreme Court held that Internet content providers and civil liberties groups were entitled to a preliminary injunction against enforcement of the Child Online Protection Act ("COPA") because the plaintiffs were likely to prevail on their claim that COPA violated the First Amendment by unduly burdening adults' access to protected speech.  1245 S.Ct. at 2794.  Notably, however, the Supreme Court stopped short of declaring COPA unconstitutional.  *Id.* at 2793 - 95.  The Court held that, instead of considering the broader question of the constitutionality of COPA, the United States Court of Appeals for the Third Circuit should have remanded the case to the district court to conduct a "full trial on the merits."[3]

---

[3]  In *Ashcroft*, the plaintiffs initially sought and received a preliminary injunction in district court against enforcement of COPA.  The Government appealed the district court's decision to the United States Court of Appeals for the Third Circuit.  The Court of Appeals affirmed the preliminary injunction, but on a different ground. 217 F.3d 162, 166 (3d Cir. 2000). The Third Circuit concluded that the "community standards" language in COPA by itself rendered the statute unconstitutionally overbroad. *Id.* The Supreme Court granted certiorari and reversed, holding that the community-standards language did not, standing alone, make the statute unconstitutionally overbroad. *Ashcroft I*, 535 U.S. at 585.  The Court remanded the case to the Third Circuit to reconsider whether the district court had been correct to grant the preliminary injunction.  On remand, the Third Circuit again affirmed the district court. 322 F.3d 240 (3d Cir. 2003).  This time, the Court of Appeals concluded that the statute was not narrowly tailored to serve a compelling Government interest, was overbroad, and was not the least restrictive means available for the Government to serve the interest of preventing minors from using the Internet to gain access to materials that are harmful to them.  *Id.* at 266-71.  The Supreme Court again granted certiorari.  540 U.S. 944 (2003).  The Court upheld the Third Circuit's decision insofar as it affirmed the entry of the preliminary injunction, but the Court specifically declined to engage in the statutory construction embraced by the Court of Appeals. *Id.* at 6 ("[W]e agree with the Court of Appeals that the District Court did not abuse its discretion in entering the preliminary injunction.  Our reasoning in support of this conclusion, however, is based on a narrower, more specific grounds than the rationale the Court of Appeals adopted. The Court of Appeals, in its opinion affirming the decision of the District Court, construed a

*Id.* at 2794.  The Court held in relevant part as follows:

> A statute that effectively suppresses a large amount of speech that adults have a
> constitutional right to receive and to address to one another . . . is unacceptable
> if less restrictive alternatives would be at least as effective in achieving the
> legitimate purpose that the statute was enacted to serve.  When plaintiffs
> challenge a content-based speech restriction, the burden is on the Government
> to prove that the proposed alternatives will not be as effective as the challenged
> statute.  In considering this question, a court assumes that certain protected
> speech may be regulated, and then asks what is the least restrictive alternative
> that can be used to achieve that goal.  The purpose of the test is not to consider
> whether the challenged restriction has some effect in achieving [the legislature's]
> goal, regardless of the restriction it imposes.  The purpose of the test is to ensure
> that speech is restricted no further than necessary to achieve the goal, for it is
> important to assure that legitimate speech is not chilled or punished.  For that
> reason, the test does not begin with the status quo of existing regulations, then
> ask whether the challenged restriction has some additional ability to achieve [the
> legislature's] legitimate interest.  Any restriction on speech could be justified
> under that analysis.  Instead, the court should ask whether the challenged
> regulation is the least restrictive means among available, effective alternatives.

*Id.* at 2791 (internal quotation marks and citations omitted) (first alteration in original).

Applying this framework, the Court held that the district court should conduct a trial before

ruling on the constitutionality of COPA in order to allow for adequate development of the record

with respect to the question of plausible, less restrictive alternatives to the statute.  *Id.* at 2794.

###    B.    *Ashcroft's* Impact on the Pending Motions

Plaintiffs argue that while the Supreme Court in *Ashcroft* directed the district court to

undertake additional factual development, *Ashcroft* does not dictate that the court hold a trial to

resolve the matter *sub judice*.  Plaintiffs distinguish *Ashcroft* on four principal bases: (1) the

record in this case is not stale, as it was in *Ashcroft*; (2) the procedural posture of *Ashcroft* and

---

number of terms in the statute, and held that COPA, so construed, was unconstitutional.  None
of those constructions of statutory terminology, however, were relied on by or necessary to the
conclusions of the District Court.").

this case differ significantly; (3) the Act is a total ban on speech, whereas COPA provided safe harbors or affirmative defenses to some speakers and thus factual development on those issues had the potential to render the act constitutional; and (4) the existence of COPA itself demonstrates that the Act is not the least restrictive alternative, as COPA was more narrowly tailored and still was potentially problematic in the Supreme Court's eyes.[4]

The court agrees that *Ashcroft* is distinguishable for many of the reasons cited by Plaintiffs. First, as Plaintiffs note, the record in this case reflects the current state of Internet technology, including the availability and usefulness of filtering software and other blocking tools. In *Ashcroft,* at least one of the Court's bases for remanding for additional factfinding was that the factual record did "not reflect current technological reality" where the factfinding of the district court had been entered over five years before the case reached the Supreme Court. 124 S.Ct. at 2794. As the Court noted, this constitutes a "serious flaw in any case involving the Internet" because "the technology of the Internet evolves at a rapid pace." *Id.* In contrast, the present case does not involve stale information, as both parties' expert disclosures have been prepared in the last year and a half. Moreover, Plaintiffs' expert, Dr. Cranor, affirms in a

---

[4] Importantly, Defendants do not argue that *Ashcroft* requires a full trial on the merits. In fact, both parties conceded at oral argument that a trial was unnecessary as the case was ripe for disposition on the record presently before the court.

As discussed more fully below, Defendants, for the first time, raise affirmative arguments that the Act is the least restrictive means of accomplishing the state's goals. To this end, Defendants state simply that

> the least restrictive alternative is the statute in question because an internet publisher can use age verification measures or labeling to block access to harmful material by minors while imposing minimal burdens on users or internet publishers. Filtering, which Plaintiffs advocate, is not completely effective and imposes financial burdens on families.

(Def. Mem. at 2).

Supplemental Declaration that her earlier conclusions regarding "[I]nternet technology, the ineffectiveness of the Act, and the greater effectiveness of less restrictive alternatives remain true today." (Pl. Mem. at 8; Cranor Suppl. Decl. at ¶¶ 3, 4). There is no danger of stale information on Defendants' part, either, as Defendants' expert, Dr. Olsen, prepared his report on the technological issues in November of 2004. Given Cranor's uncontroverted affirmation that her report reflects current technology, and that Olsen's report was only recently prepared, the stale information concern that motivated the *Ashcroft* Court to remand for additional factfinding and a full trial is not at issue here.

Moreover, as Plaintiffs point out, *Ashcroft* arose in a decidedly different procedural posture than the matter *sub judice*. In *Ashcroft*, the question presented was whether the district court had acted properly in *preliminarily enjoining* COPA based on its determination that the plaintiffs were likely to succeed on the merits. Thus, the district court had only made a threshold determination, based on the preliminary evidence before it, as to the ultimate merits of the plaintiffs' claims. *See Ashcroft*, 124 S.Ct. at 2795 ("The parties, because of the conclusion of the Court of Appeals that the statute's definitions rendered it unconstitutional, did not devote their attention to the question whether further evidence might be introduced on the relative restrictiveness and effectiveness of alternatives to the statute."). In the matter *sub judice*, in contrast, the parties' briefing is devoted to precisely the issues of relative restrictiveness and effectiveness of alternatives to the Act, as the case is already at the summary judgment/permanent injunction stage.[5]

---

[5] In addition, the questions surrounding the alternative technologies at issue have been repeatedly litigated recently in both the Supreme Court and the Fourth Circuit, rendering the court's task of making determinations about the restrictiveness and effectiveness of available

Additionally, the fact that COPA contained safe harbor and affirmative defense provisions for speakers who restricted access to prohibited materials by using age verification measures may explain the Court's remand for additional factfinding.[6]  Because the Act was not a total ban on "harmful to minors" speech, it was possible that, upon remand and additional factfinding on credit card verifications and digital pins, COPA could be found to be constitutional.  The same is not true with respect to the Act, as it constitutes a total ban on speech and explicitly provides that mistake of age does not constitute a defense to criminal liability.  Thus, while further factfinding in *Ashcroft* could serve the purpose of proving that COPA was constitutional, the same cannot be said here.[7]  *Cf. PSINet,* 362 F.3d at 227 ("Both sides concede that the 1999 Act is not narrowly tailored if it effects a total ban on the display of all 'electronic file[s] or message[s]' containing 'harmful' words, images or sounds records . . . as the plain language of the statute seems to indicate.").  While the State does not concede that this is true with respect to the Act, as explained more fully below, the Act, which, unlike COPA, is absent any safe harbors and affirmative defenses and constitutes a total ban on an entire

_____

technologies all the easier.

[6] COPA contains an affirmative defense which shields from liability Internet speakers who restrict access to prohibited materials through (1) "requiring use of a credit card, debit account, adult access code, or adult personal identification number," or (2) acceptance of a "digital certificate that verifies age," or (3) "any other reasonable measures that are feasible under available technology."  47 U.S.C. § 231(c)(1).

[7] As an additional distinguishing factor not cited by Plaintiffs, remand in *Ashcroft* was at least partially premised on the notion that the district court should "take account of a changed legal landscape[,]" as in the intervening years between the district court and Supreme Court opinions, Congress had passed at least two additional statutes that "might qualify as less restrictive alternatives to COPA[.]" 124 S.Ct. at 2795.  In stark contrast, the court is aware of no actions by the South Carolina legislature that would in any way impact the least restrictive alternatives determination.

10

medium of speech, cannot be saved from constitutional infirmity by additional factfinding.

### C. The Merits of the First Amendment Claim

Turning to the merits, this action mirrors a wealth of cases challenging, on First Amendment grounds, state and federal statutes which resemble the Act. Federal courts have unanimously concluded that these acts are unconstitutional. *See Reno v. ACLU,* 521 U.S. 844 (1997); *PSInet,* 362 F.3d at 239; *American Booksellers Found. for Free Expression v. Dean,* 342 F.3d 96 (2d Cir. 2003), *aff'g* 202 F. Supp. 2d 300, 316 (D. Vt. 2002); *ACLU v. Johnson,* 194 F.3d 1149 (10th Cir. 1999), *aff'g* 4 F.Supp. 2d 1029 (D. N.M. 1998); *Cyberspace Communications, Inc. v. Engler,* 142 F.Supp. 2d 827 (E.D. Mich. 2002); *Am. Libraries Ass'n v. Pataki,* 969 F.Supp. 160 (S.D.N.Y. 1997). Because, like the statutes at issue in these cases, the Act is a content-based regulation of speech, it must be struck down unless the State proves that it is narrowly tailored to advance a compelling interest. *See, e.g., Reno,* 521 U.S. at 870.

There is no doubt that the regulation of minors' access to obscene material is a compelling interest. *See Ginsberg v. New York,* 390 U.S. 629, 639 (1968); *FCC v. Pacifica Found.,* 438 U.S. 726, 749 (1978); *PSINet,* 362 F.3d at 234 ("It is clear that the government's interest in protecting minors from sexually explicit Internet materials is compelling."). The pertinent question, then, is whether the Act is narrowly tailored to advance that interest. A law is narrowly tailored if (1) it employs the least restrictive means to achieve its goal, and (2) there is a nexus between the government's compelling interest and the restriction. *See, e.g., City of Richmond v. J.A. Croson, Co.,* 488 U.S. 469 (1989). In the words of the *Ashcroft* Court, a statute that "effectively suppresses a large amount of speech that adults have a constitutional right to

11

receive and to address to one another . . . is unacceptable if less restrictive alternatives would

be at least as effective in achieving the legitimate purpose that the statute was enacted to serve."

*Ashcroft,* 124 S.Ct. at 2791. The State bears the burden of proving "that the proposed

alternatives will not be as effective as the challenged statute" and may not simply prove that the

Act has "some effect in achieving [the legislature's] goal." *Id.*[8]

> ### i. Age Verification and Labeling Do Not Render the Act Constitutionally Acceptable

The State now proposes that the Act is the least restrictive alternative because minimally

burdensome measures are available to commercial Internet speakers who want assurances that

juveniles will not use their websites.[9] Specifically, Defendants cite (1) age verification, and (2)

labeling as means to save the Act from constitutional infirmity. *See* Def. Mem. at 2 ("the least

restrictive alternative is the statute in question because an [I]nternet publisher can use age

---

[8] According to *Ashcroft,*

> The purpose of the [least restrictive means] test is to ensure that speech is restricted no further than necessary to achieve the goal, for it is important to assure that legitimate speech is not chilled or punished. For that reason, the test does not begin with the status quo of existing regulations, then ask whether the challenged restriction has some additional ability to achieve Congress' legitimate interest. Any restriction on speech could be justified under that analysis. Instead, the court should ask whether the challenged regulation is the least restrictive means among available, effective alternatives.

124 S.Ct. at 2791.

[9] Plaintiffs first argue that because the Act does not provide an affirmative defense for Internet speakers who use the age verification and labeling measures proposed by the State. As Plaintiffs note, the Act explicitly provides that "mistake of age is not a defense." S.C. Code § 16-15-385. The court is reluctant to read a defense into the statute which the legislature declined to adopt. *See PSINet,* 362 F.3d at 236. As Plaintiffs argue, the fact that the Act contains no defense for mistake of age is also highly problematic. *See, e.g., Dean,* 202 F.Supp. 2d at 318; *Cf. Reno,* 521 U.S. at 874-75 (making clear that a choice between self-censorship and compliance with a criminal law violates the First Amendment).

verification measures or labeling to block access to harmful material by minors while imposing minimal burdens on users or [I]nternet publishers."). In brief, "age verification" describes a system whereby the Internet speaker accepts and verifies a credit card before allowing access. Alternatively, age verification can describe a system whereby a third party website provides passwords/PINs to speakers who supply credit cards. "Labeling" requires that Internet speakers label every webpage with harmful material with text such as "XXX" or "obscene for minors." Operating systems/web browsers can then be programmed to block such material.

Unfortunately for Defendants, the Fourth Circuit and Supreme Court (as well as a wealth of other district courts) have explicitly rejected age verification and labeling as effective means of achieving the state's ends of regulating harmful to minors speech on the Internet. *See, e.g., Reno v. ACLU,* 521 U.S. 844, 881 (1997)*; PSI Net,* 363 F.3d at 236-37. These courts have unanimously concluded that these measures are far too burdensome, and chill adults' ability to engage in, and garner access to, protected speech for a wealth of reasons.

First, with respect to age verification as the State proposes here, as in *PSINet,* "[the State's age verification] resolution to the statute's First Amendment problems creates First Amendment problems of its own." *PSINet,* 362 F.3d at 236. Specifically, age verification deters lawful users from accessing speech they are entitled to receive. *See ACLU v. Ashcroft,* 322 F.3d 240, 259 (3d Cir. 2003) (holding that mandatory age verification was problematic because "[p]eople may fear to transmit their personal information, and may also fear that their personal, identifying information will be collected and stored in the records of various websites or providers of adult identification numbers."); *PSINet,* 363 F.3d at 236 (accepting the district court's conclusion that "the stigma associated with the content of these Internet sites may deter

13

adults from visiting them if they cannot do so without the assurance of anonymity."); *Dean,* 202 F.Supp. 2d at 317; *Johnson,* 4 F.Supp. 2d at 1033 (holding that an analogous statute violates the First Amendment "because it prevents people from communicating and accessing information anonymously.").[10]   Defendants' expert does not contend otherwise.   When asked at his deposition whether he agreed that there was a stigma associated with accessing certain websites without anonymity, Olsen admitted

> [J]ust like any other part of the human experience there are things that people will not wish to experience unless they can be anonymous.  The Internet is no different. . . . I believe there are some adults who would not visit some sites if required [to comply with age verification measures] . . . "

(Olsen Dep. at 169-70).

Additionally, age verification is problematic because it requires the use of a credit card, which not all adults have.  *See PSINet,* 363 F.3d at 237 ("[s]uch a restriction would also serve as a complete block to adults who wish to access adult material but do not own a credit card" and thus "unduly burden[s] protected speech in violation of the First Amendment."); *see also Reno,* 521 U.S. at 856 ("the imposition of [a credit card verification] requirement would completely bar adults who do not have a credit card and lack the resources to obtain one from accessing any blocked material") (internal citation omitted).  Moreover, to the extent that the

---

[10]  A study by the National Research Council ("NRC") confirms the First Amendment difficulties with age verification.  In that study, the NRC concludes:

> [S]ome [age verification technologies] enable - indeed require - systematic tracking of all sites that use a given age certification, thus allowing a dossier of visited adult sites to be compiled.  Thus, they may inhibit free flow of information and create a chilling effect on the freedom of adults who wish to access lawful though perhaps controversial material.

*See* NATIONAL RESEARCH COUNCIL, YOUTH, PORNOGRAPHY, AND THE INTERNET 343 (National Academy of Sciences 2002) (hereinafter "The NRC Study").

14

State relies on third party verification services in lieu of credit-card based age verification, these systems have similarly been rejected by reviewing courts because of the stigma associated with their use. *See, e.g., Dean,* 202 F.Supp. 2d at 308 ("Relative to the number of users of the Internet, very few people use adult age-verification passwords such as Adult Check(R). There is a stigma associated with using such services.").

Finally, the State's proposed age verification system would pose significant costs for Internet speakers who have to segregate harmful and non-harmful material, and update and maintain this system. *See Reno*, 521 U.S. at 881-82 ("[I]t is not economically feasible for most noncommercial speakers to employ [verified credit card or adult PIN] verification."); *Dean,* 202 F.Supp. 2d at 316("[F]inancial and practical difficulties associated with credit card verification or adult password verification services" impose a "heavy, if not impossible, compliance burden."); *see also* Olsen Dep. at 121-22, 177. Imposing such a cost on protected speech is constitutionally problematic. *See Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.,* 502 U.S. 105, 115 (1991) ("A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech."). Additionally, the time that a technical expert would have to devote to this system is also significant. (Olsen Decl. at 10-11). Moreover, users are likely to incur costs under any age verification system. *See* Olsen Dep. at 91-92 (noting that credit card companies will not verify a credit card number if there is no accompanying charge to the consumer); Olsen Decl. at 11 (admitting that third party age-verification sites which dispense adult PINs and passwords also frequently require at least a nominal payment). According to Defendants' expert, credit card companies will not verify a credit card number if there is no accompanying sale, purchase, or

other charge to the consumer.  As a result, Internet users would  likely incur at least a nominal

charge in accessing constitutionally-protected speech that would otherwise be provided for free.

In short, the State's proposal to effectively tax the distributors of protected speech runs counter

to "a notion so engrained in [Supreme Court] First Amendment jurisprudence" that the

difficulties with this proposal are "so obvious as to not require explanation." *Simon & Schuster,*

502 U.S. at 508.

      The State's labeling proposal creates many of the same constitutional burdens on

protected speech.  First, labeling was squarely rejected by the Supreme Court as ineffective in

*Reno,* 521 U.S. at 881.  While noting that appropriate labeling software did not exist at the time,

the *Reno* Court held that

> Even if it did, there is no way to know whether a potential recipient will actually
> block the encoded material. Without the impossible knowledge that every
> guardian in America is screening for the '[label]', the transmitter could not
> reasonably rely on its action to be effective.

*Id.*; see also Pl. Mem., Ex. 3A, The Commission on Child Online Protection Report (finding that

labeling requirements "raise[ ] First Amendment concerns due to the financial cost to

constitutionally protected sites, blocking of unlabeled sites, and the threat that voluntary labeling

regimes might be made mandatory.").  These conclusions squarely counter Defendants'

suggestion that *Reno* rejected labeling only because the technology at that time was insufficient.

Instead, *Reno* spoke to the broader issue of the ultimate efficacy of any labeling system.[11]

---

[11]  In any event, Dr. Olsen's testimony that effective labeling technology now exists is
unconvincing.  Olsen only avers that labeling requires no new technology on the part of the
speaker, and simple technology on the part of the recipient.  (Olsen Decl. ¶ 12).  This does not
speak to the question of the costs involved in setting up a labeling system, or the system's likely
ineffectiveness as articulated above.  Plaintiffs' expert Cranor affirms there have been no new
material advances in Internet technology since *Reno* which would resolve these difficulties with

ii.     **Equally Effective and Less Restrictive Alternatives are Available**

As the court noted in an earlier Order, there is "no indication" that the South Carolina legislature even "considered less restrictive means, such as filtering mechanisms, to protect children from receiving obscene materials over the Internet." (Order of July 25, 2003). The State provides almost no justification for its argument that the Act is less restrictive than user-based tools (including filtering) for safeguarding minors from harmful material on the Internet, except to offer the assertion that filtering "is not completely effective and imposes financial burdens on families." (Def. Mem. at 2). The State also suggests that filtering is not effective as to images, and may require constant parental supervision.

The State's argument that the Act is less restrictive than filtering mechanisms is directly at odds with the Supreme Court's recent ruling in *Ashcroft*. In *Ashcroft*, the Court specifically held that "[f]ilters are less restrictive than COPA [,]" a statute that is decidedly narrower than the Act.[12] 124 S.Ct. at 2792. While acknowledging that filtering software "is not a perfect solution," 124 S.Ct. at 2793, the Court explained

---

a labeling system. (Cranor Supplemental Decl. ¶ 2). Moreover, no other court has concluded that labeling is an effective means to further the state's goals, and the Fourth Circuit expressly rejected this opinion by Dr. Olsen, who served as Virginia's expert in *PSINet*.

[12] For example, COPA provided an affirmative defense to individuals who employed certain means to prevent minors from accessing prohibited materials on their websites. Under COPA, an individual could escape conviction by demonstrating that he had

> restricted access by minors to material that is harmful to minors –
> (A) by requiring use of a credit card, debit account, adult access code, or adult personal identification number;
> (B) by accepting a digital certificate that verifies age, or
> (C) by any other reasonable measures that are feasible under available technology.

47 U.S.C. § 231(c)(1).

> [Filters] impose selective restrictions on speech at the receiving end, not universal restrictions at the source. Under a filtering regime, adults without children may gain access to speech they have a right to see without having to identify themselves or provide their credit card information. Even adults with children may obtain access to the same speech on the same terms simply by turning off the filter on their home computers. Above all, promoting the use of filters does not condemn as criminal any category of speech, and so the potential chilling effect is eliminated, or at least much diminished.

124 S.Ct. at 2792. In short, given the Supreme Court's unequivocal statement that filters are less restrictive than COPA, the State's contention that the Act is the least restrictive alternative is wholly without merit.[13] *See, e.g., Dean*, 202 F.Supp. 2d at 319 n.17 ("a less restrictive and more effective solution [than Vermont's harmful to minors statute] lies in widely available, user-based controls on computers."); *PSINet,* 108 F.Supp.2d at 625 ("Less intrusive and more effective means of limiting online access by children to adult materials are widely available to parents and other users who wish to restrict or block access to online sites, etc., that they feel are inappropriate.").

Moreover, the Act fails strict scrutiny because the State has failed to prove that it is more effective at achieving the State's interest in protecting minors than Plaintiffs' proffered less restrictive alternative of filtering. Again, this conclusion is dictated by *Ashcroft,* as the Supreme Court held that "[b]locking and filtering software is an alternative that is less restrictive than

---

[13]   Notably, throughout its memoranda, the State relies on the dissenting views of members of the *Ashcroft* and *PSINet* decisions. *See, e.g.,* Def. Mem. at 3 ("Judge Niemeyer vigorously dissented from the Panel decision . . . [and] found no First Amendment violation by the statute . . . . Although Virginia's law differs somewhat from South Carolina's, the same conclusion applies here . . . "); Def. Mem. at 6 ("Justice Breyer's dissent in *Ashcroft,* in which the Chief Justice and Justice O'Connor joined, is instructive on the limitations of filtering . . . ."); Def. Mem. at 9 ("Plaintiffs may note that the Defendants have relied heavily upon dissenting opinions. This reliance is not a weakness in the State's position. As the Internet changes, case law may change."). The court disagrees. As Plaintiffs point out, these remain the dissenting views from the majority rule, and the court is bound by the majority opinions.

18

COPA, and in addition, likely more effective as a means of restricting children's access to materials harmful to them." 124 S.Ct. At 2792. In the words of the Court, filters are likely more effective than age verification measures for a number of reasons, including (1) filters can prevent minors from seeing all pornography, not just pornography posted to the web from America; (2) filters do not allow for "evasion and circumvention" by minors with their own credit cards; and (3) filters can be applied to all forms of Internet communications, including email, not just communications available via the web. *Id.*[14]

Here, the State admits that much of the harmful to minors material at issue originates from overseas, and that the Act does nothing to prevent material of foreign origin. Courts have unanimously concluded that the inability to curtail the flow of sexually-explicit materials from abroad is a fatal flaw in statutes such as the Act. *See PSINet*, 362 F.3d at 238 & n.6 (holding that "there is no benefit to a law which merely reduces the number of pornographic responses to an Internet search by a juvenile from 186,000 responses to 183,000 responses"). Given that filtering mechanisms screen out sexually-oriented material regardless of its origin, the State has no plausible argument that the Act is more effective on this basis alone.

Additionally, as the Supreme Court noted in *Ashcroft,* it is undisputed that minors can garner access to credit cards and consequently access restricted sites, similarly rendering the age

---

[14] The NRC confirms the effectiveness of filters:

Filters are capable of blocking inappropriate sexually explicit materials at a high level of effectiveness - if a high rate of overblocking is also acceptable. Thus, filters are a reasonable choice for risk-averse parents or custodians (e.g. teachers) who place a very high priority on preventing exposure to such material and who are willing to accept the consequences of such overblocking.

NRC Study at 303.

19

verification measures suggested by the State ineffective.  The State's expert, Dr. Olsen, does not dispute this point.  (Olsen Dep. at 89-90; 94-96; 101).[15]  As was the case in *Ashcroft,* "not only has [the State] failed to carry its burden of showing . . . that the proposed alternative is less effective, but also a Government Commission appointed to consider the question has concluded just the opposite."  *Ashcroft*, 124 S.Ct. at 2793.  Because the State has wholly failed to demonstrate that the Act is the least restrictive alternative, and an effective means of accomplishing its goals, the Act cannot survive strict scrutiny.  Accordingly, Plaintiffs are entitled to summary judgment on their First Amendment claims.[16]

## II.  Commerce Clause Claim

As Plaintiffs argue, the Commerce Clause provides a separate and independent basis for striking down the Act.[17]  *See* U.S. Const. Art. I, § 8, Cl. 3.  A wealth of federal courts, including

---

[15]  Plaintiffs also cite convincing testimony from an executive at VISA U.S.A. taken before the Commission on Child Online Protection, in which he states that

> Access to a credit card or a debit card is not a good proxy for age.  The mere fact that a person uses a credit card or a debit card in connection with a transaction does not mean that this person is an adult . . . . [A]lthough [COPA] assumes that only adults have access to a credit card or debit card, it is important for the Commission to understand that this assumption simply is not true.

Pl. Reply Mem. at 28-29.  As noted above, the State's expert, Dr. Olsen, concurs.  *See* Olsen Dep. at 101 ("The statement of Mr. McCarthy corroborates exactly what I believe to be true about credit cards and debit cards.").

[16]  Plaintiffs also challenge the Act on overbreadth grounds.  The Constitution protects against "overbroad laws that chill speech within the First Amendment's vase and privileged sphere."  *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 244 (2002).  The First Amendment proscribes a statute as overbroad if it prohibits a substantial amount of protected expression.  In addition to the fact that the Act is constitutionally infirm because it is not narrowly tailored, because the Act clearly penalizes a substantial amount of constitutionally protected speech, it also violates the First Amendment's proscription of overbroad laws.  *See, e.g., PSINet,* 362 F.3d at 234.

[17]  Because the First Amendment violation is "sufficient to carry the day[,]" *PSINet,* 167 F.Supp. at 890, the court only addresses the Commerce Clause claim in brief.

four courts of appeals, have held that similar state laws violated the Commerce Clause. *See, e.g.,* *PSINet*, 362 F.3d at 240; *Dean,* 342 F.3d at 102-05; *Johnson,* 194 F.3d at 1161-62; *Cyberspace Communications, Inc. v. Engler,* 238 F.3d 420 (6th Cir. 2000); *Dean,* 202 F.Supp. 2d at 319-321; *Pataki*, 969 F.Supp. at 169. Like the factual situation in these cases, here, it is undisputed that (1) Internet speakers have no practical, reliable means of determining the geographic location of the recipients of their online communications; *see* Cranor Initial Decl. ¶ 14(2), 21; and (2) Internet speakers have no way of ensuring their communications are not accessed in a certain geographic location, such as the State of South Carolina,. *see id.*

The Commerce Clause prohibits state regulation that "discriminates against or unduly burdens interstate commerce" and thereby "imped[es] free private trade in the national marketplace." *General Motors Corp. v. Tracy,* 519 U.S. 278, 287 (1997) (internal citations omitted). As the Fourth Circuit noted in *PSI Net,* 362 F.3d at 239, the Southern District of New York decided a leading case on application of the Commerce Clause to the Internet several years ago *See American Libraries Ass'n v. Pataki,* 969 F.Supp. 160 (S.D.N.Y. 1997). In *American Libraries Ass'n,* the Southern District of New York found a state law criminalizing certain Internet content to be violative of the Commerce Clause because there was no means by which to limit access to online materials by geographic location. *Id.* at 168 ("The unique nature of the Internet highlights the likelihood that a single actor might be subject to haphazard, uncoordinated, and even out-right inconsistent regulation by states that the actor never intended to reach and possibly was unaware were being accessed."). Accordingly, a website owner operating legally in California would be forced to comply with New York's criminal laws to avoid being subject to liability there. *Id.* at 174. Because this could deter California website

operators from placing material on the Internet, New York's law would have discouraged legitimate commerce wholly outside New York's borders and thus imposed an undue burden on interstate commerce.  *Id.*

Similarly here, the Act is invalid because it places an undue burden on interstate commerce by regulating commerce occurring wholly outside of South Carolina.  *See Healy v. Beer Inst.,* 491 U.S. 324, 336 (1989).  In the words of the Fourth Circuit, "[t]he content of the internet is analogous to the content of the night sky.  One state simply cannot block a constellation from the view of its own citizens without blocking or affecting the view of the citizens of other states."  *See, e.g., PSINet,* 362 F.3d at 240; *see also Dean,* 342 F.3d at 103 ("[T]he internet's boundary-less nature means that internet commerce does not quite occur[ ] wholly outside [Vermont's] borders.").  Like the statute at issue in *PSINet,* "[g]iven the broad reach of the Internet, it is difficult to see how a blanket regulation of Internet material, such as [the Act], can be construed to have only a local effect."  *Id.*

Moreover, the Act constitutes an invalid indirect regulation of interstate commerce because the burdens it imposes on interstate commerce are excessive in relation to the local benefit conferred.  *See id.* at 240; *see also Pike v. Bruce Church, Inc.,* 397 U.S. 137 (1970) (outlining the balancing test for indirect regulations of interstate commerce; the court first looks to legitimacy of the state interest, then considers the burden on interstate commerce in light of the local benefit).  Like the statute at issue in *PSINet,* the Act will be wholly ineffective in achieving South Carolina's goal of protecting minors because nearly half of all Internet communications originate overseas and will not be affected by the Act.  (Cranor Suppl. Decl. ¶ 4(d)).  Thus, the Act will provide little, if any, local benefit.  *See PSINet,* 362 F.3d at 238.

Accordingly, just as in *PSINet*, the Act at issue violates the Commerce Clause, and Plaintiffs are entitled to summary judgment on this basis as well.[18]

## CONCLUSION

It is therefore **ORDERED,** for the foregoing reasons, that Plaintiffs' Motion for Summary Judgment is **GRANTED.** Defendants' Motion for Summary Judgment is **DENIED.** The Defendants are hereby **PERMANENTLY ENJOINED and PROHIBITED from** enforcing S.C. Code Ann. § 16-15-375 and S.C. Code Ann. § 16-15-385.

**AND IT IS SO ORDERED.**

**s/ Patrick Michael Duffy**

**PATRICK MICHAEL DUFFY**
**UNITED STATES DISTRICT JUDGE**

**Charleston, South Carolina**
**May 9, 2005**

---

[18]  Again, Defendants' only argument relies on Judge Niemeyer's dissent in *PSINet.* (Def. Mem. at 8).  Notably, Defendants never attempt to distinguish *PSINet*.

23